Fred B. HULSE, James M. Reeves, Forrest M. Hemker, Clyde J. Linde and C. Wallace Walter, members of the Advisory Committee, Informants,

v.

BROTHERHOOD OF RAILROAD TRAINMEN, an International Railroad Labor Union, and W. P. Kennedy, C. R. Maher, Phillip B. Lush, Dan McGlynn, W. A. Woodson, E. G. Gunn, Frank Zamarioni and G. A. McNurlan, individually and as class representatives of all of the members of Brotherhood of Railroad Trainmen, Respondents.

No. 47293.

Supreme Court of Missouri,

En Banc.

Nov. 14, 1960.

Consent Decree

Now on this 14th day of November, 1960, this matter came on to be heard before this Court, the informants appearing by their attorneys, Roberts P. Elam and George S. Hecker, the respondents, Brotherhood of Railroad Trainmen, W. P. Kennedy, W. A. Woodson, E. G. Gunn and Dan McGlynn and Frank Zamarioni appearing by their attorney, Daniel P. Reardon, the respondents Phillip B. Lush and G. A. McNurlan appearing by their attorneys, Lyman Field and Clay C. Rogers, and the respondent, C. R. Maher, having never been served with process, not appearing, the report of the Special Commissioner heretofore appointed by this Court being before this Court, and the Court, being fully advised in the premises, finds as follows:

1. The parties hereto have entered into a written stipulation filed herein, which stipulation and the report of the Special Commissioner are by this reference made a part hereof.

2. The respondent, Brotherhood of Railroad Trainmen (hereinafter sometimes referred to as the "Brotherhood"), is a railway labor union, having in excess of 200,-000 members, the great majority of whom are employed as railroad trainmen. It is governed by a body known as the "Grand Lodge of the Brotherhood of Railroad Trainmen," and it conducts its business functions and operations through subordinate lodges, sometimes referred to as "local lodges," located in the various states of the Union, some 35 of which are located in the State of Missouri.

3. In 1930, the Brotherhood established a "Legal Aid Department" by order of its then president, following a referendum ballot of its local lodges, which was explained in Special Circular No. W–28 from the office of the then president of the Brotherhood, A. F. Whitney under date of April 15, 1930, as follows:

"The establishment of the bureau, as well as the making of agreements with regional attorneys throughout the United States, will be *consumated* as soon as consistently possible, and notice of its establishment will be printed in the 'Railroad Trainman' for the information and guidance of all members.

"Briefly, the plan contemplates the establishment at Grand Lodge headquarters of a bureau, with the necessary legal and clerical assistance, to advise injured members, and the dependents of those who may be killed, as to their rights respecting claims for damage. This assistance will not only be given to injured members, and the dependents of those killed, but also to proper subordinate lodge officers and committeemen, for the purpose of assisting injured members, or dependents, in negotiating settlements. No fee or charge will be made to the members for this advice.

"In order to secure advice it will be necessary to furnish the bureau with a full statement of facts surrounding the injury or death, so that questions of liability may be determined. In injury cases not involving the loss of limbs or other specific injuries, it will be necessary to furnish medical statements clearly describing the character and extent of the injury. In cases where investigations must necessarily be made before passing upon the question of liability, which instances are more likely to occur with reference to death cases, the Legal Aid Bureau will undertake to make the necessary investigations, calling to its assistance officers of subordinate lodges and committeemen. It is hoped a full measure of cooperation will be given by these members.

"Because of the great volume of minor injuries occurring to members of the Brotherhood employed on railroads of the country, it will be impossible to give assistance or advice in cases of minor injuries where employees are able to return to work in a comparatively short time. It is felt that, at the outset at least, the bureau should not be requested to give information to employees who can return to work within ninety days. This attitude is taken not only because of the extremely increased burden of work which would be thrust upon the Legal Aid Bureau incident to answering inquiries relative to minor injuries, but by the further fact that it is invariably to the best interest of a railroad employee, receiving a minor injury, to return to work, thereby preserving seniority rights with his employer.

"In the minor injury cases railroads usually pay for time lost and it is felt it is better in all cases to accept such settlements than to employ lawyers. It is equally true that as time goes on, the committeemen will be familiarized with the rights of members under the law and will probably be able to assist injured members in negotiating adjustments of minor claims with reasonably satisfactory results.

"In all cases where the disability is not permanent and the member is able to return to his employment, it is the belief of the undersigned that every effort should be made to bring about amiciable settlements with the railroad company. It is almost the uniform practice of the railroads of the United States to discharge an employee for employing a lawyer. It is also the practice of most railroads to refuse employment to applicants who have previously brought suit against another railroad. Age restrictions subscribed to and followed by most railroads militate against men, who have passed the prescribed age limit, who are seeking employment.

We believe that by following a policy of attempting to reach fair settlements with the railroad employers of the country, taking the minor injury cases out of the hands of lawyers, we will be able to improve conditions with respect to the settlement of injury cases as they now exist.

"In cases where employees are permanently injured so that they cannot return to their former occupation, it is expected that every fair and reasonable effort will be made to adjust claims for damages direct with the railroads, either by the injured member himself or through the medium of his chosen representative among the officers and members of the Brotherhood.

"In cases where fair settlements cannot be obtained in this manner and where it appears necessary to litigate such claims, the Brotherhood will select attorneys located at strategic points in the United States, to whom injured members, and dependents of those killed, may resort for advice and assistance.

"Our agreements with these attorneys will require them to advise members without charge with a view to enabling them, or their representatives among the officers and members of the Brotherhood, to negotiate settlements direct with the railroad company. In all cases where it becomes necessary to commence suit, these regional lawyers will prosecute the cases of these members, and dependents, for a contingent fee of twenty percent of the net amount recovered in settlement of trial.

"Contracts will be entered into directly between these lawyers and the claimants on forms approved by the Legal Aid Bureau. Regional attorneys will be required to advance all necessary court costs, expert witness fees, expense of medical examinations, etc. These expenses will be deducted from

the amount of the recovery before a division is made of the net amount recovered. All expenses incurred in handling of claims by regional attorneys will be subject to approval by the Legal Aid Bureau. A small portion of the attorney's fee, not yet definitely determined upon, will be turned over to the Grand Lodge for the purpose of maintaining the Legal Aid Bureau. There will be no obligation upon the part of members to consult or employ regional counsel, but we believe it will be to their best interest to do so in cases where such consultation seems advisable for the reason that the Brotherhood will contract with only high class, capable and experienced railroad damage suit lawyers, and the charges in such cases will be from thirteen to thirty percent less than is now charged for similar service.

"The injured member, or dependent, will at all times retain control of his case in the hands of the regional attorney, so that no settlement may be made without his approval.

"The Brotherhood will not assume any responsibility for the care and maintenance of injured members during the pendency of the adjudication of their claims. This, of course, will not interfere with the usual assistance which is given in needy cases by subordinate lodges, nor prevent members from entering into any agreements for financial assistance which they may see fit to enter into with lawyers they have employed to handle their claims.

"It must be understood that the Legal Aid Bureau will be entirely separate from the beneficiary and pension departments of the Brotherhood, and that no efforts which may be put forth by the bureau or any regional counsel to secure adequate compensation for injured men will be construed as having any relationship to the allowance or disallowance of insurance or pension

claims. Regional attorneys will be required to report all settlements and verdicts to the Legal Aid Bureau, together with a statement of facts showing cause of the injury and extent of the disability; this for the purpose of determining whether maximum results are being obtained by certain regional lawyers in certain regions as compared with those in other regions.

"The Legal Aid Bureau will periodically disseminate information to the several regional counsel, as well as to the lodges and members, bearing upon the rights of injured railroad men and the work of the bureau."

4. The Legal Aid Department of the Brotherhood maintained and maintains a central office in Cleveland, Ohio, at the national headquarters of the Brotherhood. In that office, it has a chief clerk, who is in charge of the Department, stenographers, file clerks and a research analyst. The Cleveland office of the Legal Aid Department serves as a clearing house which receives reports from all Brotherhood subordinate or local lodges of instances in which members have been injured or killed in railroad accidents. It notifies the appropriate regional counsel, and regional investigator, hereinafter referred to in more detail, of all such accidents.

5. Operating in conjunction with the Legal Aid Department were approximately sixteen lawyers, each designated by the Brotherhood as a "Regional Counsel," and assigned a zone, or region, of operation, which at times followed geographical lines, but at other times instead, tended to follow railroad system lines. The dominant considerations in the selection of regional counsel were the Brotherhood's confidence in the ability of the attorney. Also operating in conjunction with the Legal Aid Department were a number of "Regional Investigators," whose principal function and duty was to see to it that the officers of the local or subordinate lodges reported to the Legal Aid Department instances of in-

jury to and death of members of the Brotherhood so that the records of the Legal Aid Department would be complete. They sometimes made preliminary investigations of the facts surrounding such an injury or death. They also engaged in other activities hereinafter referred to, relating to the employment of Regional Counsel in cases involving such injuries and deaths.

Respondent McNurlan stated that his duties as Regional Investigator were as follows:

"As Regional Investigator for the Brotherhood of Railroad Trainmen, it has been my function in the case of railway accidents to members of the Brotherhood resulting in personal injuries or death to make a preliminary investigation of all such accidents coming to my attention from either the Cleveland Office of the Legal Aid Department or from a local Lodge officer or from the Brotherhood member involved, and within my territory hereinbefore outlined, in order to: (1) gather certain necessary information and statistics on each such accident for the Cleveland Office of the Legal Aid Department on the cause of the accident, the nature and extent of the injuries and the fault, if any, upon the part of the railroad company, including any apparent violations of the Safety Appliance Act, the Boiler Inspection Act, the Air Brakes Act, the 72 Hour Law and the Hours of Service Law [45 U.S.C.A. §§ 1 et seq., 22 et seq., 61 et seq.]; (2) apprise the injured member, or the survivors in the case of death, of the existence of the various departments of the Brotherhood, including Insurance, Legal Aid and Protective Departments as they might relate to the particular circumstances of the casualty involved.

"My function as Regional Investigator also includes performing such special duties as the national President assigns to me from time to time, * * *.

"It has also been part of my function to do investigative work for Regional or Legal Counsel.

"My function as Regional Investigator further includes assisting various local lodge officers and injured members of the Brotherhood in obtaining information and advice on matters pertaining to grievances, local Lodge functions and matters, state meetings, etc.

"It is further my function as Regional Investigator to answer any questions injured members, or their survivors, have respecting casualties sustained by them, that are proper for me to answer as a lay investigator, or to refer any questions, if the member desires it, that involve giving legal advice or legal counsel, to the Regional or Legal Counsel."

6. The 1930 plan for the operation of the Legal Aid Department originally was that the injured member, or survivor or representative of a member who had sustained fatal injury, would contract with regional counsel for representation in a claim or case against the railroad on a 20 per cent contingent fee basis, with the agreement on the part of regional counsel to turn over one-fourth of that fee, or 5 per cent of the recovery, to the Brotherhood for maintenance of the Legal Aid Department. Such contracts were to be on forms approved by the Legal Aid Department, and such regional counsel was to advance all necessary court costs, expert witness fees, expense of medical examinations, and like expenditure items. These expenses were to be deducted from the amount of recovery before a division would be made of the net sum between the regional counsel and the claimant. Subsequently, and about in the year 1938, a change was made in the contingent fee provisions so that the claimant was required to sign two contracts covering a contingent fee of 25 per cent— one contract calling for 19 per cent to the regional counsel for his services, and the other for 6 per cent to the Brotherhood for

the maintenance of the Legal Aid Department, with its investigating service. As of June 15, 1946, this fee procedure was again changed so as to permit regional counsel to handle the cases on a flat 25 per cent basis, but requiring them to pay the investigators, members of the Brotherhood staff, on a quantum meruit basis, for their services. Another change in this fee and expense procedure subsequently occurred, which persisted up until the time of the filing of the instant proceeding. Under this change, regional counsel agreed with the Brotherhood to, and did, charge a 25 per cent contingent fee, and agreed to, and did, pay all court costs, medical examination fees, expert witness fees, transcript costs, cost of printing on appeals, and the total cost of operating the Legal Aid Department. This latter item—i. e. the total cost of operating the Legal Aid Department— was apportioned among the regional counsel in the ratio that the respective gross recoveries of each regional counsel bore to the total gross recoveries by regional counsel throughout the country. Periodically throughout the year the Legal Aid Department assessed each regional counsel for his proportionate share of the total cost of operating such Department, and at the end of the year each regional counsel was billed for the balance of his assessment. The Brotherhood also maintained a practice of apportioning the expenses of its conventions amongst its various "departments" on the basis of the amount of time spent in discussing, on the floor of the convention, the affairs of that department. The Legal Aid Department's share of this cost was assessed against and paid by regional counsel.

7. The Brotherhood constitution requires that the secretary of each local lodge submit to the Legal Aid Department a report on each injury or death of a member in railroad service, and blank forms were furnished to the local lodges for the making of such reports. It was the duty of the local chairman of each lodge of the Brotherhood, or some other official of such lodge, to call upon the injured member, or the bereaved family of a fatally injured member, and advise them that they were entitled to avail themselves of the benefits of the Legal Aid Department free of charge, could consult regional counsel regarding their rights arising out of the injury or death free of charge, and could employ regional counsel at a charge not in excess of 25 per cent of the amount of any recovery, and that such percentage would include expenses incidental to the investigation and litigation of the claim. These representatives of the Brotherhood's local lodges and the regional investigators recommended and urged the injured member, and the families of deceased members, that their claims and cases against railroads be handled by the Legal Aid Department, and that the Brotherhood's regional counsel be employed to prosecute such claims and cases.

8. While the members of the Brotherhood were not compelled to employ regional counsel for the handling of their claims and suits, the fact that Regional Counsel had been designated, who they were, and that they were available to the Brotherhood members through the Legal Aid Department was regularly brought to the attention of the membership, not only in the manners above set out, but through the Brotherhood's publications, circulars and convention programs, and by announcements and talks on the subject made at meetings of various sorts. We note that, in two jurisdictions other than Missouri, namely; California and Illinois (Cf. Hildebrand v. State Bar of California, 1950, 36 Cal.App.2d 504, 225 P.2d 508, 509, and In re Brotherhood of Railroad Trainmen, 1958, 13 Ill.2d 391, 150 N.E.2d 163), it has been found that the following practices were carried on in those jurisdictions under the Brotherhood's national Legal Aid Department plan, viz.: the local lodge officers or representatives who made contact with the injured member, and the regional investigator, carried blank copies of contracts for the employment of regional coun-

sel, or the firm of attorneys with which the regional counsel was affiliated; if a signed contract of employment of regional counsel was not obtained in the field, an injured member, or the representative of a deceased member, or the other interested party, were often brought to the office of regional counsel, sometimes by a regional investigator, and sometimes by some other member-representative of the Brotherhood; in such cases, the expenses of the trips were paid by regional counsel, and the expenses of the regional investigator or other member-representative (including reimbursement of the latter for his time at his regular hourly wage rate) were also paid by regional counsel; and, in addition, on many occasions, the person or persons bringing an injured member, or the representative of a deceased member, to the office of regional counsel would be given a "gratuity" in money by regional counsel. However, neither of the respondents Lush, McGlynn, McNurlan, Zamarioni, Gunn or Woodson were parties to the California or Illinois proceedings.

9. The respondent Phillip B. Lush was and is a lawyer admitted to the practice of law within the State of Minnesota. Since May 23, 1949, he has been one of the Regional Counsel for the Brotherhood under the Legal Aid Department plan, assigned to a zone, region or territory which included portions of the State of Missouri, and mostly in western Missouri. Since February 1, 1952, he has been a member of the Brotherhood. Prior to January 1, 1956, he was a member of the law firm of Davis, Rerat, Yeager & Lush located in Minneapolis, Minnesota, and, since January 1, 1956, he has been the sole member of a law firm known as Davis & Lush, located in said city and state.

10. The respondent Dan McGlynn was and is a lawyer admitted to the practice of law in the State of Illinois, with an office in the City of East St. Louis, Illinois. Since July 1, 1954, he has been a member of the Brotherhood of Railroad Trainmen. Since May 1, 1954, he has been a Regional Counsel of the Brotherhood under the Legal Aid Department plan of the Brotherhood, and, as such, since March 1, 1956, was assigned to a zone or region of operation which included portions of the State of Missouri, mostly in eastern Missouri.

11. The respondent W. P. Kennedy, was, and now is, a member and President of the respondent Brotherhood of Railroad Trainmen, and a member of its Grand Lodge. Amongst his functions as such President were the appointment and removal of the Regional Counsel and the Regional Investigators, who served at his pleasure, the determination and designation of the zone, region or territory for their operations, and the general control and supervision of the Legal Aid Department.

12. The respondents W. A. Woodson and E. G. Gunn, were, and now are, residents of the State of Missouri, members of the Brotherhood, and officers of local or subordinate lodges of the Brotherhood located in the State of Missouri. As such members and lodge officers, each performed in Missouri the duties required of them by, and conducted themselves in Missouri in accordance with, the aforesaid Legal Aid Department plan.

13. The respondent G. A. McNurlan was and is a resident of the State of Wisconsin. He has been, since October 15, 1954, a Regional Investigator for the Brotherhood under the aforesaid Legal Aid Department plan for the zone, region or territory which coincided with the zone, region or territory of respondent Lush's operations in Missouri as Regional Counsel. In addition to being such Regional Investigator, and paid by the respondent Brotherhood as such, respondent McNurlan was employed by respondent Lush as an investigator of so-called "non-brotherhood cases," and was paid a salary and expenses by respondent Lush in that capacity.

14. The respondent Frank Zamarioni was and is a resident of the City of East St. Louis, Illinois. Since March 12, 1956,

he has been a Regional Investigator for the Brotherhood under the aforesaid Legal Aid Department plan, for a zone, region, or territory which included a portion of the zone, region or territory of respondent McGlynn's operations in Missouri as Regional Counsel.

15. None of the respondents has ever been admitted to the practice of law in the state of Missouri, or authorized to practice law in said State.

16. Each subordinate lodge of the respondent Brotherhood had one or more designated persons whose duty it was to report to the Cleveland office as aforementioned, and aid the regional investigator in contacting its injured members, or the dependents of a member who had been killed in a railroad accident, and the respondents W. A. Woodson and E. G. Gunn, among others, acted in such capacity in Missouri.

■ 17. In the opinion of this Court, the national Brotherhood Legal Aid Department plan, as it has evolved and to the extent it has been followed and observed in Missouri, providing for contacting such injured member of the Brotherhood, or the dependents of a member who had been killed, by the representatives of the Brotherhood, including respondents McNurlan, Zamarioni, Woodson and Gunn, has been conducive to and has resulted in solicitation in Missouri of the employment of regional counsel, including respondents Lush and McGlynn, for the purpose of collecting damages against railroad companies. The Court also has been advised by the Informants, and this Court believes, that there has, in some instances, been solicitation in fact by the respondents. This Court further finds, in this connection, that, in accordance with the Legal Aid Department plan of the Brotherhood, in some instances as a result of some contacts in Missouri on the part of the said representatives of the Brotherhood, contracts were secured with such prospective clients whereby regional counsel, including respondents Lush and McGlynn, were employed to represent such clients in their claims for personal injuries or damages for death; and such regional counsel, including respondents Lush and McGlynn, acknowledge that they have in some instances with respect to such clients advanced funds for medical examination, other costs and expenses of litigation and, in some instances, would advance funds for living expenses of the clients while said action was pending.

18. The persons so contacted represented both members and non-members of the Brotherhood, and, where the client was a member of the Brotherhood, generally provided for the payment of a contingent attorney fee in the amount of 25 per cent of whatever was recovered, and in the case of non-members for a fee of 33⅓ per cent of whatever was recovered.

19. Salaries and compensation paid to the respondents McNurlan and Zamarioni as Regional Investigators were paid by respondents Lush and McGlynn, either directly, or indirectly by having such sums channeled through the Legal Aid Department of the Brotherhood.

20. The aforementioned law firm of Davis & Lush, of which respondent Lush was the sole member, employed, among others, one Louis N. Crill, an attorney residing in Excelsior, Minnesota, the respondent McNurlan, another Regional Investigator named G. A. Clinkenbeard, and three stenographers named Romayne Chiorabel, Mary C. Graham, and Joy Shughart. During the period from March 1, 1956, to February 15, 1959, there was maintained at Room 508 Wirthman Building, 3100 Troost Avenue, Kansas City, Missouri, an office which was designated upon its door, upon the building directory, and in the Kansas City telephone directory, as "Brotherhood of Railroad Trainmen, Investigation Office." The business in said office was conducted by respondent Lush, and the employees of his law firm just above mentioned. Some cor-

respondence was carried on from there on the letterhead of respondent Lush's Minneapolis law firm. There was available there, as well as in the possession of McNurlan, a form of letter, which in the opinion of the Informants here amounts to a form of contract and which respondent Lush acknowledges amounts to a "form of offer to contract," as follows:

"Davis and Lush
"604 Baker Building
"Minneapolis, Minnesota

"Gentlemen:

"I would like to have you represent me in my claim against the ————— Railroad Company arising out of my accident on —————.

"I am willing to pay you twenty-five per cent of the amount recovered by settlement or suit, plus court costs and witness fees, but not including your expenses.

"If you agree to handle my case on this basis I want it understood that you will not settle my case without my consent and that the check will be made payable to me.

"If you are willing to handle my case on this basis, please sign the extra copy of this letter and return it to me.

Yours very truly,"

These letter forms were frequently completed, by the filling in of the appropriate blank spaces and being signed, by persons having claims against railroad companies, and, when executed by said persons were forwarded to Minneapolis for acceptance by respondent Lush. All of the expenses of said office in Kansas City, in the aggregate amount of at least $23,268.15 (exclusive of salary paid to McNurlan), were paid by respondent Lush, or his law firm of Davis & Lush.

21. The respondent Lush paid to the Brotherhood, as his share of the expense of operation of the Legal Aid Department, a total of $31,825.68 during the period from January 1, 1956, to March 25, 1960. The respondent McGlynn paid to the Brotherhood, for such purpose, a total of $8,622.-00 during the period from August 1, 1955, to March 3, 1958.

22. Since January 1, 1956, the respondent Lush was employed by at least 27 residents of Missouri, all but one of whom resided in western Missouri, to represent them in claims against railroad companies arising out of injuries or death. Since March 1, 1956, the respondent McGlynn was employed by at least 12 persons, residents of or who were injured in eastern Missouri, to represent them in claims against railroad companies arising out of injuries.

23. The respondents, and each of them, represent that they are fully cognizant with the decision of the Supreme Court of Illinois in the case of In re Brotherhood of Railroad Trainmen, 1958, 13 Ill.2d 391, 150 N.E.2d 163, 167(5), wherein it was said:

"The objective of the Brotherhood in seeking to secure competent legal representation of its members can be accomplished without lowering the standards of the legal profession. The Brotherhood has a legitimate interest in investigating the circumstances under which one of its members has been injured. That interest antedates the occurrence of any particular injury. We are of the opinion that the Brotherhood may properly maintain a staff to investigate injuries to its members. It may so conduct those investigations that their results are of maximum value to its members in prosecuting their individual claims, and it may make the reports of those investigations available to the injured man or his survivors. Such investigations can be financed directly and without undue burden by the 218,000 members of the Brotherhood.

"The Brotherhood may also make known to its members generally, and to

injured members and their survivors in particular, first, the advisability of obtaining legal advice before making a settlement and second, the names of attorneys who, in its opinion, have the capacity to handle such claims successfully. Its employees, however, may not carry contracts for the employment of any lawyer, or photostats of settlement checks. No financial connection of any kind between the Brotherhood and any lawyer is permissible. No lawyer can properly pay any amount whatsoever to the Brotherhood or any of its departments, officers or members as compensation, reimbursement of expenses or gratuity in connection with the procurement of a case. Nor can the Brotherhood fix the fees to be charged for services to its members. The relationship of the attorney to his client must remain an individual and a personal one."

24. The respondents, and each of them, have represented that they presently are not engaging in any of the practices condemned in the above quoted decision, nor in any of the improper practices hereinbefore referred to and set forth, and that they will not engage in any such practices in Missouri at any time in the future; therefore, and thereupon, the Informants, consisting of the Advisory Committee of the Missouri Bar Administration, have dismissed their Information with respect to contempt as to all respondents, and the Citation to show cause why respondents should not be punished for contempt should be withdrawn as to all respondents without prejudice.

It Is Therefore, Ordered, Adjudged And Decreed:

I. That, as to the respondent C. R. Maher, only, who was never served with process, this cause is dismissed without prejudice.

II. That, the Information and Citation, insofar as the same relate to contempt, be, and the same are hereby, dismissed as to each respondent, without prejudice.

■ III. That in the procurement, within the State of Missouri, of the employment of a lawyer to render any legal services, the respondents Brotherhood of Railroad Trainmen, W. P. Kennedy, G. A. McNurlan, Frank Zamarioni, W. A. Woodson, and E. G. Gunn, and all persons in any way or in any manner acting by, through and under them or either of them, are hereby jointly and severally permanently enjoined and restrained from, in any way or in any manner:

a. Telling any person or his representatives that said person has a cause of action, the amount he is entitled to recover, where suit should be filed, or doing any other act or thing which constitutes the practice of law within the State of Missouri;

b. Negotiating or attempting to negotiate contracts of employment for legal services on behalf of any lawyer or lawyers;

c. Accepting pay or any gratuity or benefit whatsoever, directly or indirectly, from any lawyer, person or organization for services in obtaining contracts of employment for legal services;

d. Either personally or for or on behalf of any other person, loaning or advancing or promising to loan or advance money to any person or his representative pending trial or settlement of his claim or suit;

e. Displaying, exhibiting, or showing copies or photographs of checks, releases, newspaper accounts or other data concerning settlement made on behalf of other claimants for the purpose of inducing any person, or his representatives, or which may tend to induce said person, to enter into contracts for the legal services of any lawyer;

f.   Making unsolicited calls upon any person for the purpose of soliciting contracts for the employment of a lawyer by such person, or for the purpose of recommending or urging the employment of a lawyer by such person;

g.   Conspiring with any resident or nonresident lawyer to violate the laws of Missouri concerning the practice of law within the State of Missouri, or the Canons of Legal Ethics imposed by the Supreme Court of Missouri on lawyers licensed to practice law in the State of Missouri;

h.   Violating or aiding or abetting the violation of the provisions of paragraphs IV and V of this decree.

■  IV.   That in the procurement, within the State of Missouri, of employment of him to render legal services, the respondent Phillip B. Lush as an individual and as a lawyer admitted to the practice of law within the State of Minnesota, and all persons acting by, through or under him, in any way or in any manner, either personally or by or through an agent, servant, employee, partner, or associate are hereby jointly and severally enjoined and restrained from in any way or in any manner:

a.   Soliciting employment as a lawyer in the State of Missouri;

b.   Paying any person, either directly or indirectly, for services rendered within the State of Missouri in obtaining or soliciting such employment of him, or accepting any such employment or any benefit derived from any such solicitation;

c.   Promising to loan or advance, or loaning or advancing, money to any person or persons at any time for the purpose of inducing said person or persons to employ said respondent, either jointly or severally;

d.   Communicating in any way with any person for the purpose of soliciting such employment;

e.   Violating the laws of Missouri concerning the practice of law within the State of Missouri or Canons of Legal Ethics imposed by the Supreme Court of Missouri, required of and observed by resident lawyers licensed in the State of Missouri;

f.   Conspiring to violate the laws of the State of Missouri or the Canons of Legal Ethics imposed by the Supreme Court of Missouri on lawyers licensed to practice in the State of Missouri;

g.   In any way or in any manner violating or aiding and abetting the violation of the provisions of Paragraph III of this decree.

V.   That in the procurement, within the State of Missouri of employment of him to render legal services, the respondent Dan McGlynn as an individual and as a lawyer admitted to the practice of law in the State of Illinois, and all persons acting by, through or under him, in any way or in any manner, either personally or by or through an agent, servant, employee, partner or associate, are hereby jointly and severally enjoined and restrained from in any way or in any manner:

a.   Soliciting employment as a lawyer in the State of Missouri;

b.   Paying any person, either directly or indirectly, for services rendered within the State of Missouri in obtaining or soliciting such employment of him, or accepting any such employment or any benefit derived from any such solicitation;

c.   Promising to loan or advance, or loaning or advancing, money to any person or persons at any time for the purpose of inducing said person or persons to employ said respondent, either jointly or severally;

d.   Communicating in any way with any person for the purpose of soliciting such employment;

e. Violating the laws of Missouri concerning the practice of law within the State of Missouri or Canons of Legal Ethics imposed by the Supreme Court of Missouri, required of and observed by resident lawyers licensed in the State of Missouri;

f. Conspiring to violate the laws of the State of Missouri or the Canons of Legal Ethics imposed by the Supreme Court of Missouri on lawyers licensed to practice in the State of Missouri;

g. In any way or in any manner violating or aiding and abetting the violation of the provisions of Paragraph III of this decree.

VI. The respondent Brotherhood of Railroad Trainmen, its officers, employees and representatives, and all persons in any way or in any manner acting by, through or under it, are hereby permanently restrained and enjoined from in any way or in any manner fixing the fees of any lawyer or lawyers for services rendered to its members, or dependents or personal representatives of deceased members.

VII. The respondent Brotherhood of Railroad Trainmen, its officers, employees and representatives, and all persons in any way or in any manner acting by, through or under it, are hereby permanently restrained and enjoined from having any financial connection with any lawyer or lawyers wherein or whereby such lawyer or lawyers in any way or in any manner would support or maintain the Legal Aid Department, or any similar department or bureau, of said Brotherhood.

VIII. That costs of this proceeding are hereby taxed against the respondents.

BY THE COURT:

/s/ Laurance M. Hyde
    Chief Justice
    Supreme Court of Missouri

The foregoing Consent Decree is approved as to content and form.

/s/ Roberts P. Elam and George S. Hecker
    Attorneys for Informants

/s/ Lyman Field—Clay C. Rogers
    Attorney for respondents Phillip B. Lush and G. A. McNurlan

/s/ Daniel P. Reardon
    Attorney for respondents Brotherhood of Railroad Trainmen. W. P. Kennedy, W. A. Woodson, E. G. Gunn, Dan McGlynn and Frank Zamarioni