# UNITED TRANSPORTATION UNION *v.* STATE BAR OF MICHIGAN

No. 434.   Argued January 20, 1971—Decided April 5, 1971

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, and MARSHALL, JJ., joined.   HARLAN,

J., filed an opinion concurring in part and dissenting in part, *post*, p. 586. WHITE, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 600. STEWART, J., took no part in the decision of the case.

*John J. Naughton* argued the cause and filed a brief for petitioner.

*A. D. Ruegsegger* argued the cause for respondent. With him on the brief were *Phillip C. Kelly* and *Louis Rosenzweig*.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

The Michigan State Bar brought this action in January 1959 to enjoin the members of the Brotherhood of Railroad Trainmen[1] from engaging in activities undertaken for the stated purpose of assisting their fellow workers, their widows and families, to protect themselves from excessive fees at the hands of incompetent attorneys in suits for damages under the Federal Employers' Liability Act.[2] The complaint charged, as factors relevant to the cause of action, that the Union recommended selected attorneys to its members and their families, that it secured a commitment from those attorneys that the maximum fee charged would not exceed 25% of the recovery, and that it recommended Chicago lawyers to represent Michigan claimants. The State Bar's complaint appears to be a plea for court protection of un-

---

[1] On January 1, 1969, after the decree was entered in the court below, the Brotherhood of Railroad Trainmen merged into a newly created union, the United Transportation Union. The successor union is the petitioner in this case.

[2] 35 Stat. 65, as amended, 45 U. S. C. §§ 51–60.

limited legal fees. The Union's answers admitted that it had engaged in the practice of protecting members against large fees and incompetent counsel; that since 1930 it had recommended, with respect to FELA claims, that injured member employees, and their families, consult attorneys designated by the Union as "Legal Counsel"; that prior to March 1959, it had informed the injured members and their families that the legal counsel would not charge in excess of 25% of any recovery; and that Union representatives were reimbursed for transporting injured employees, or their families, to the legal counsel offices.

The only evidence introduced in this case was the testimony of one employee of the Association of American Railroads in 1961 that from 1953 through 1960 a large number of Michigan FELA claimants were represented by the Union's designated Chicago legal counsel. Based on this evidence and the Union's admissions set out above, the state trial court in 1962 issued an order enjoining the Union's activities on the ground that they violated the state statute making it a misdemeanor to "solicit" damage suits against railroads.[3] The Union appealed to the Michigan Supreme Court, but before the case was argued on appeal, this Court handed down its decision in *Brotherhood of Railroad Trainmen* v. *Virginia State Bar*, 377 U. S. 1 (1964), involving a similar injunction secured by the Virginia State Bar against the Union. We held in that case that the First Amendment guarantees of free speech, petition, and assembly give

---

[3] Section 750.410, Mich. Comp. Laws (1948), in relevant part provides:

"Any person . . . or organization of any kind, either incorporated or unincorporated . . . who shall directly or indirectly . . . solicit any person injured as the result of an accident . . . for the purpose of representing such person in making claim for damages . . . shall be guilty of a misdemeanor . . . ."

railroad workers the right to cooperate in helping and advising one another in asserting their rights under the FELA. While not deciding every question that possibly could be raised, our opinion left no doubt that workers have a right under the First Amendment to act collectively to secure good, honest lawyers to assert their claims against railroads.

Acknowledging our decision in *Trainmen,* the Michigan Supreme Court remanded the instant case to the state trial court with permission for amendment of the complaint "to seek, if it be so advised, relief not inconsistent with the Supreme Court's said opinion." 374 Mich. 152, 155, 132 N. W. 2d 78, 79. After remand, the State Bar made a motion for further proceedings. That motion was heard on February 5, 1965, at which time the Bar declined to amend its complaint. For reasons not explained in the record, the case lingered in the trial court until May 24, 1968. On that date, after a motion for judgment by the State Bar and arguments on the motion, the trial court adopted verbatim the injunction entered in the Virginia state courts after our remand in *Trainmen.*

In affirming the trial court decree, the material part of which is set out below,[4] the Michigan Supreme Court gave our holding in *Trainmen* the narrowest possible

---

[4] The decree entered by the Michigan trial court permanently restrained and enjoined the Union:

"from giving or furnishing legal advice to its members or their families; from informing any lawyer or lawyers that an accident has been suffered by a member or non-member of the said Brotherhood and furnishing the name and address of such injured or deceased person for the purpose of obtaining legal employment for any lawyer; from stating or suggesting that a recommended lawyer will defray expenses of any kind or make advances for any purpose to such injured persons or their families pending settlement of their claim; from controlling, directly or indirectly, the fees charged or

reading,[5] focusing only on the specific literal language of the injunctive provisions challenged in that case rather than the broad range of union activities held to be protected by the First Amendment. Similarly, the Michigan court erroneously restricted our holding in *United Mine Workers* v. *Illinois State Bar Assn.,* 389 U. S. 217 (1967), to "the operative portion" of the Illinois decree prohibiting any financial connection between the attorney and the Union. The Michigan Supreme Court failed to follow our decisions in *Trainmen, United Mine Workers,* and *NAACP* v. *Button,* 371 U. S. 415 (1963), upholding the First Amendment principle that groups can unite to assert their legal rights as effectively and economically as practicable. When applied, as it must be, to the Union's activities reflected in the record of this case, the First Amendment forbids the restraints imposed by the injunction here under review for the following among other reasons.

*First.* The decree approved by the Michigan Supreme Court enjoins the Union from "giving or furnishing legal advice to its members or their families." Given its broadest meaning, this provision would bar the Union's members, officers, agents, or attorneys from giving any kind of advice or counsel to an injured worker or his family concerning his FELA claim. In *Trainmen* we upheld the commonsense proposition that such activity is protected by the First Amendment. Moreover, the

---

to be charged by any lawyer; from accepting or receiving compensation of any kind, directly or indirectly, for the solicitation of legal employment for any lawyer, whether by way of salary, commission or otherwise; from sharing in any manner in the legal fees of any lawyer or countenancing the splitting of or sharing in such fees with any layman or lay agency; and from sharing in any recovery for personal injury or death by gift, assignment or otherwise."

[5] 383 Mich. 201, 174 N. W. 2d 811.

plain meaning of this particular injunctive provision would emphatically deny the right of the Union to employ counsel to represent its members, a right explicitly upheld in *United Mine Workers* [6] and *NAACP* v. *Button*.

We cannot accept the restricted interpretation of this provision urged by the State Bar, and accepted by our Brother HARLAN, that it only prohibits the Union or its members themselves from "practicing law." The record is devoid of any evidence or allegation of such conduct on the part of the Union or its members. A decree must relate specifically and exclusively to the pleadings and proof. If not so related, the provision, because of its vagueness, will jeopardize the exercise of protected freedoms. This injunction, like a criminal statute, prohibits conduct under fear of punishment. Therefore, we look at the injunction as we look at a statute, and if upon its face it abridges rights guaranteed by the First Amendment, it should be struck down. Our statement in *NAACP* v. *Button* concerning the statute there in question is equally applicable to the injunction now before us: "[W]e cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." 371 U. S., at 438.

*Second.* The decree also enjoins the Union from furnishing to any attorney the names of injured members or information relating to their injuries. The investigation of accidents by Union staff for purposes of gathering evidence to assist the injured worker or his family in asserting FELA claims was part of the Union practice

---

[6] The decree overturned in *United Mine Workers* also enjoined the union from: "Giving legal counsel and advice." 389 U. S., at 218 n. 1. It was conceded in that case that the provision was directed at the Union's employment of an attorney.

upheld in *Trainmen.* 377 U. S., at 4 n. 8. It would seem at least a little strange now to hold that the Union cannot communicate that information to the injured member's attorney.[7]

*Third.* A provision of the decree enjoins the members of the Union from "accepting or receiving compensation of any kind, directly or indirectly, for the solicitation of legal employment for any lawyer, whether by way of salary, commission or otherwise." The Union conceded that prior to 1959, Union representatives were reimbursed for their actual time spent and out-of-pocket expenses incurred in bringing injured members or their families to the offices of the legal counsel. Since the members of a union have a First Amendment right to help and advise each other in securing effective legal representation, there can be no doubt that transportation of injured members to an attorney's office is within the scope of that protected activity. To the extent that

---

[7] Our Brother HARLAN suggests that the injured member should be free to direct the collected information to whatever lawyer he chooses, rather than for the Union to give it to the Union's recommended legal counsel. However, the injunction prohibits the Union from furnishing the information to "any lawyer," apparently including both recommended and nonrecommended counsel alike. The injunction would prohibit the injured member's attorney, regardless of whether or not he was recommended by the Union, from communicating with the Union's representative who investigated the accident, is familiar with the facts, and, other than the injured member himself, is probably the person most qualified to answer the attorney's questions and assist in preparation of the claim. To satisfy the Michigan court's notion that direct communication between the Union and the member's attorney is somehow unlawful, it seems our Brother HARLAN would restrict the Union's efforts, which we expressly approved in *Trainmen,* of assisting the injured member in preparing his case for trial, to a written accident report filed with the injured member.

the injunction prohibits this practice, it is invalid under *Trainmen, United Mine Workers,* and *NAACP* v. *Button.*

*Fourth.* Our Brothers HARLAN and WHITE apparently accept the State Bar contention that the provision prohibiting compensation to Union representatives for solicitation refers to compensation paid by the attorney rather than the Union. And so interpreted, it supplements the two provisions which prohibit the Union from sharing in legal fees received by the recommended counsel. There is no basis for this restraint. Such activity is not even suggested in the complaint. There is not a line of evidence concerning such practice in the record in this case. If there is any such suggestion, it is in records in other cases involving other parties in other courts, records upon which we believe our Brother HARLAN erroneously seeks to rely. In fact, the explanation for the appearance of the provisions in this decree appears to be the Michigan court's verbatim adoption of a Virginia injunction issued in a different case on different pleadings relating to different facts. Decrees between litigants should not rest on any such unsupportable basis as this.

Our Brother HARLAN appears to concede that the State Bar has neither alleged nor proved that the Union has engaged in the past, is presently engaging, or plans to engage, in the sharing of legal fees. Nonetheless, he suggests that the injunction against such conduct is justified in order to remove any "temptation" for the Union to participate in such activities. We cannot accept this novel concept of equity jurisdiction that would open the courts to claims for injunctions against "temptation," and would deem potential "temptation" to be a sufficient basis for the issuance of an injunction. Indeed, it would appear that jurisdiction over "temptation" has heretofore been reserved to the churches.

An injunction can issue only after the plaintiff has established that the conduct sought to be enjoined is illegal and that the defendant, if not enjoined, will engage in such conduct. In *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 262 (1917), this Court struck the portions of a decree enjoining a union from picketing and physical violence because there was no evidence that either of these forms of interference was threatened.[8] Likewise in the present case, with respect to the prohibition against sharing legal fees, the State Bar simply has made no showing that such conduct was threatened. Indeed, it has made no showing at all. Therefore, that provision of the decree, to use an often quoted slogan, would appear to be not only unjustified, but also "arbitrary and capricious."

*Fifth.* Finally, the challenged decree bars the Union from controlling, directly or indirectly, the fees charged by any lawyer. The complaint alleged that the Union sought to protect its members from excessive legal fees by securing an agreement from the counsel it recommends that the fee will not exceed 25% of the recovery, and that the percentage will include all expenses incidental to investigation and litigation. The Union in its answer admitted that prior to 1959 it secured such agreements for the protection of its members.

*United Mine Workers* upheld the right of workers to act collectively to obtain affordable and effective legal representation. One of the abuses sought to be remedied by the Mine Workers' plan was the situation pursuant to which members "were required to pay forty or fifty per cent of the amounts recovered in damage suits, for attorney fees." 389 U. S., at 219. The Mine

---

[8] Mr. Justice Brandeis dissented on the ground that this principle should have been applied to strike the other provisions of the injunction as well. 245 U. S., at 263 (Brandeis, J., dissenting).

Workers dealt with the problem by employing an attorney on a salary basis, thereby providing free legal representation for its members in asserting their claims before the state workmen's compensation board. The Union in the instant case sought to protect its members against the same abuse by limiting the fee charged by recommended attorneys. It is hard to believe that a court of justice would deny a cooperative union of workers the right to protect its injured members, and their widows and children, from the injustice of excessive fees at the hands of inadequate counsel. Indeed, the Michigan court was foreclosed from so doing by our decision in *United Mine Workers.*[9]

In the context of this case we deal with a cooperative union of workers seeking to assist its members in effectively asserting claims under the FELA. But the principle here involved cannot be limited to the facts of this case. At issue is the basic right to group legal action, a right first asserted in this Court by an association of Negroes seeking the protection of freedoms guaranteed by the Constitution. The common thread running through our decisions in *NAACP* v. *Button, Trainmen,* and *United Mine Workers* is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or

---

[9] The injunction also bars the Union "from stating or suggesting that a recommended lawyer will defray expenses of any kind or make advances for any purpose to such injured persons or their families pending settlement of their claim." The only allegation in the complaint possibly relating to this injunctive provision is that the Union representatives informed the injured members that the 25% fee included all expenses. This provision of the injunction, therefore, is invalid for the same reasons that the provision limiting fees is invalid.

others the means of enabling their members to meet the costs of legal representation. That was the holding in *United Mine Workers, Trainmen,* and *NAACP* v. *Button.* The injunction in the present case cannot stand in the face of these prior decisions.

*Reversed.*

MR. JUSTICE STEWART took no part in the decision of this case.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

The Court's conclusions with respect to the issues presented by the case at bar are, in my view, flawed by the absence of any examination of the relationship between this case and the substantially contemporaneous proceedings in Illinois and Virginia against the same union with respect to the same charges of unprofessional conduct in the Brotherhood's "Legal Aid Department."

## I

The history of the establishment of the Legal Aid Department and the early attacks upon it by state and local bar associations, with the assistance and encouragement of the Association of American Railroads, has been fully recounted elsewhere. See Bodle, Group Legal Services: The Case for *BRT*, 12 U. C. L. A. L. Rev. 306, 307–317 (1965); Note, 50 Cornell L. Q. 344 (1965). The most significant point in this history, for present purposes, came in the late 1950's. With disciplinary proceedings pending against its Regional Counsel in Chicago,[1] the Brotherhood counterattacked by moving in the Supreme Court of Illinois for a declaration that the Brotherhood's plan was both legal and compatible with the minimum

---

[1] The Chicago Regional Counsel had jurisdiction over the lower peninsula of Michigan, where this lawsuit was brought. App. 14.

standards of professional conduct. After hearings before a special commissioner, the Illinois court found that the basic facts with respect to the operation of the Legal Aid Department were not seriously disputed:

> "As it presently operates, the legal aid department of the Brotherhood maintains a central office in Cleveland, Ohio, at the national headquarters of the Brotherhood. In that office it has a staff consisting of a chief clerk, a research analyst, three stenographers and a file clerk. It also has a number of regional investigators. The Cleveland office serves as a clearing house which receives reports from all Brotherhood Lodges of instances in which members have been injured or killed in railroad accidents. It notifies the appropriate regional investigator and regional counsel of all accidents.
>
> .        .        .        .        .
>
> "By agreement with the Brotherhood the attorneys who are designated as regional counsel charge a fee of twenty-five per cent of the amount recovered in each case, whether recovery is by settlement or by judgment. Regional counsel have also agreed to and do pay all court costs, investigation costs, costs of doctors' examinations, expert witness fees, transcript costs and the cost of printing briefs on appeal. They also pay the total cost of operating the legal aid department of the union [including the department's ratable share of the expenses of the Brotherhood's conventions]. All expenses of the legal aid department are apportioned among the sixteen regional counsel in the ratio that their respective gross fees bear to the total gross recoveries throughout the country. . . .
>
> "The Brotherhood constitution requires that each local lodge appoint someone whose duty it is to fill out an accident report whenever a member is in-

jured, and also to make contact with the injured man, or the relatives of a man who is killed, and make it known that legal advice will be given free of charge by the regional counsel. He also makes known the availability of regional counsel to handle the claim and any ensuing litigation for a total charge of twenty-five per cent of the amount recovered by settlement or by litigation. The twenty-five per cent includes all expenses of investigation and litigation.

"The lodge member who investigates the occurrence and makes contact with the injured man recommends and urges that regional counsel be consulted and employed. These men carry blank copies of contracts employing the regional counsel's firm as attorneys. The regional investigators employed by the legal aid department also carry these contracts. If a signed contract is not obtained by an investigator in the field, an investigator often brings the interested parties to the office of the regional counsel in Chicago. The injured man may be accompanied by his wife, and if the interested party is a widow, the wife of the investigator also makes the trip. The expenses of these trips are paid immediately by regional counsel. The lodge member who investigates and urges the employment of regional counsel is also compensated by regional counsel at his regular hourly wage rate for time spent in investigating the case and in making the trip to Chicago. These amounts are paid whether or not the regional counsel is retained, and regardless of the ultimate outcome. In addition [the regional counsel in Chicago] testified, 'There are many times when one of the boys will bring in a case, and taking care of the investigation, etc., they are

given a gratuity of $100 or $150.' " *In re Brotherhood of Railroad Trainmen,* 13 Ill. 2d 391, 392–395, 150 N. E. 2d 163, 165–166 (1958).

On the basis of the facts thus found, the court laid down the following guidelines to indicate to the Brotherhood what it could and could not do in connection with personal injury and wrongful death claims with respect to its members:

"We are of the opinion that the Brotherhood may properly maintain a staff to investigate injuries to its members. It may so conduct those investigations that their results are of maximum value to its members in prosecuting their individual claims, and it may make the reports of those investigations available to the injured man or his survivors. Such investigations can be financed directly and without undue burden by the 218,000 members of the Brotherhood.

"The Brotherhood may also make known to its members generally, and to injured members and their survivors in particular, first, the advisability of obtaining legal advice before making a settlement and second, the names of attorneys who, in its opinion, have the capacity to handle such claims successfully. Its employees, however, may not carry contracts for the employment of any lawyer, or photostats of settlement checks. No financial connection of any kind between the Brotherhood and any lawyer is permissible. No lawyer can properly pay any amount whatsoever to the Brotherhood or any of its departments, officers or members as compensation, reimbursement of expenses or gratuity in connection with the procurement of a case. Nor can the Brotherhood fix the fees to be charged for services to its members. The relationship of the

attorney to his client must remain an individual and a personal one.

"The course thus outlined, if adopted, will make it possible for the Brotherhood to achieve its legitimate objectives without tearing down the standards of the legal profession." *Id.,* at 397–398, 150 N. E. 2d, at 167–168.

The court gave the Brotherhood over a year, until July 1, 1959, to bring itself into compliance with these standards. *Id.,* at 399, 150 N. E. 2d, at 168.

The decree thus rendered appeared to satisfy both the Brotherhood and the Bar. See Note, 50 Cornell L. Q. 344, 348 and n. 32 (1965); Bodle, Group Legal Services: The Case for *BRT,* 12 U. C. L. A. L. Rev. 306, 317 (1965). By letter dated March 16, 1959, the president of the Brotherhood directed all legal counsel "to live up to said opinion in its entirety" on pain of being removed from office and reported to the local bar association. The letter also announced that "[t]he Brotherhood will finance its Legal Aid Department, and will investigate accidents so that it will be acquainted with the cause of said accidents, and by so doing will be able to remedy any violation of the Federal Employers' Liability Act and the Safety Appliance Act. The result of such investigation shall be made available only to the injured person." App. 16–17. The opinion of the Illinois court and the letter of the BRT president directing compliance therewith became the basis for consent judgments in Nebraska,[2] Missouri,[3] and several other States.[4]

---

[2] *State ex rel. Beck* v. *Lush,* 170 Neb. 376, 103 N. W. 2d 136 (1960).

[3] *Hulse* v. *Brotherhood of Railroad Trainmen,* 340 S. W. 2d 404 (Mo. 1960).

[4] Initially it appeared that a consent decree might be entered in the Michigan proceedings, but this possibility never eventuated. App. 30–31.

The Virginia Bar, however, was not content with the anti-solicitation measures ordered by the Illinois court,[5] and it pressed for and obtained a more sweeping decree. That decree, as originally entered, restrained the Brotherhood

"[1] from giving or furnishing legal advice to its members or their families; [2] from holding out lawyers selected by it as the only approved lawyers to aid the members or their families; [3] from informing any lawyer that an accident has occurred and furnishing the name and address of an injured or deceased member for the purpose of obtaining legal employment for such lawyer; [4] or in any other manner soliciting or encouraging such legal employment of the selected lawyers; [5] from stating or suggesting that such selected lawyers will defray expenses and make advances to clients pending settlement of claims; [6] from controlling, directly or indirectly, fees charged or to be charged by any lawyer; [7] from making compensation for the solicitation of legal employment for any lawyer, whether by way of salary, commission or otherwise; [8] from in any manner sharing in the legal fees of any lawyer, or countenancing the splitting of such fees with any layman or lay agency; [9] and from doing any act or combination of acts, and from formulating and putting into practice any plan, pattern or design, the result of which is to channel legal employment to any particular lawyer or group of lawyers; [10] and, in general, from violating the laws govern-

---

[5] See the testimony of petitioner's president during pretrial proceedings in the Virginia case that "[i]f we thought for a moment" that a consent decree along the lines of the Illinois opinion would be acceptable "we would make it effective tomorrow." App. 91, *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U. S. 1 (1964).

ing the practice of law in the Commonwealth of Virginia." *Brotherhood of Railroad Trainmen* v. *Commonwealth ex rel. Virginia State Bar,* 207 Va. 182, 184 n. 1, 149 S. E. 2d 265, 266–267, n. 1 (1966) (numbers have been inserted for convenient reference).

The Brotherhood sought and obtained review by this Court, limiting its attack to the provisions numbered (2), (4), and (9) above. See *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U. S. 1, 4–5 (1964). This was apparently the result of a tactical decision, for it enabled the Brotherhood to argue that it had acquiesced in the restraints imposed on its activities by the Illinois Supreme Court, which that court had held were adequate to protect the ethics of the legal profession and the public interest.[6] The Brotherhood therefore could take the position that it contested the Virginia decree only because "the [Virginia] Bar sought a more restrictive injunction than the Illinois opinion suggested." Reply Brief 29, *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* No. 34, O. T. 1963.

This Court accepted the Brotherhood's contentions and reversed. On remand, the Virginia courts deleted the

---

[6] The Court acknowledged this limitation on the Brotherhood's contentions:

"Certain other provisions of the decree enjoin the Brotherhood from sharing counsel fees with lawyers whom it recommended and from countenancing the sharing of fees by its regional investigators. The Brotherhood denies that it has engaged in such practices since 1959, in compliance with a decree of the Supreme Court of Illinois. See *In re Brotherhood of Railroad Trainmen,* 13 Ill. 2d 391, 150 N. E. 2d 163. Since the Brotherhood is not objecting to the other provisions of the decree except insofar as they might later be construed as barring the Brotherhood from helping injured workers or their families by recommending that they not settle without a lawyer and by recommending certain lawyers selected by the Brotherhood, it is only to that extent that we pass upon the validity of the other provisions." 377 U. S., at 5 n. 9.

provisions struck down by this Court, replaced provision (10) with a prohibition on "sharing in any recovery for personal injury or death by gift, assignment or otherwise," altered the wording of the remaining provisions in minor respects, and upheld the modified decree as consistent with this Court's mandate. 207 Va. 182, 149 S. E. 2d 265 (1966). The Brotherhood did not seek review of this decision, and it became final in due course.

## II

Given this background, with which counsel below and the trial judge were generally familiar, the proceedings now under review appear in a substantially different posture. The State Bar's complaint charged unlawful solicitation of business. The Brotherhood's answer, after admitting the charges in some respects and denying them in others, set up the Illinois Supreme Court opinion as an affirmative defense, noting that the Michigan State Bar had been aware of that proceeding and had assisted in it, although it was not formally a party. The answer observed that the Illinois court had declared certain features of the Brotherhood's activities lawful and other features unlawful and directed the discontinuance of the latter. The answer then averred that after the filing of the Michigan complaint the Brotherhood had brought itself into compliance with the Illinois opinion. The answer quoted the above-mentioned letter from the Brotherhood's president as proof. On this basis, the Brotherhood contended that the conduct complained of either was permissible or had terminated, so that the bill should be dismissed for want of equity and for mootness. App. 15–17.

In its reply the State Bar specifically relied on the Brotherhood's admissions in the Illinois proceedings and the findings of the Illinois court as working an estoppel of the defendants with respect to at least some of the matters

there in issue. App. 20–24.[7] However, the reply leaves unclear just what the Bar considered to be involved in the Michigan lawsuit. It described the Michigan Bar's cause of action as both broader and narrower than the Illinois lawsuit. App. 23–24. The next pleading filed, a "Statement of Claim," did little to clarify matters. It referred only to the Brotherhood's scheme of solicitation of legal business, but included allegations that as part of the scheme regional counsel made payments to the Brotherhood and to regional investigators and also contributed to the financial support of clients during the pendency of litigation. App. 29.

The trial judge apparently sought to clear up the confusion as to just what was in issue by including in the pretrial summary a provision that "[i]n the event there is not a consent decree, defendants have been requested to advise what issue in Michigan is different than in the other states where consent decrees have entered." App. 30. There is nothing in the record to indicate that the defendants responded to this request in a way designed to limit the issues to solicitation.

After the initial hearing in this case the trial judge entered a decree that *inter alia* prohibited the Brotherhood from "[e]ngaging in any activity, conduct or endeavor condemned by the Supreme Court of Illinois in In re Brotherhood of Railroad Trainmen." App. 117. In this connection he observed that "although certain specific activities and conduct as contained in the Illinois decision were not specifically pleaded in the instant suit, nevertheless, by the defendants' answer, they have been indirectly injected into this litigation and should be covered by the Court's order." App. 112. Inasmuch as the activi-

---

[7] The reply also referred in passing to actions in courts of other States where the Brotherhood has been condemned for engaging in "the same or similar practices as those at issue in this cause." App. 24.

ties referred to, see *supra,* at 587–589, were directly related to the solicitation charged in the State Bar's complaint, I consider this decision by the judge to be entirely justifiable.

While it is unfortunate that the record is as stale as it is, there is ample evidence to indicate that the Brotherhood's conduct, at least as of the time the bill of complaint was filed, was of such a character as to call for the decree before us. The Brotherhood, despite its repeated allegations that the objectionable features of this conduct ceased in April 1959, failed to introduce any proof to that effect during the evidentiary hearing in 1961. In the 1965 and 1968 proceedings on remand from the Michigan Supreme Court, the Brotherhood did not request a reopening of the record, or even assert that there had been any significant change in factual circumstances since the original proceedings. Moreover, Michigan law provides for modification of a continuing injunction upon a proper showing of changed circumstances. See *First Protestant Reformed Church* v. *De-Wolf,* 358 Mich. 489, 495, 100 N. W. 2d 254, 257 (1960) (dictum), citing *United States* v. *Swift & Co.,* 286 U. S. 106, 114 (1932). With matters in this posture, I am content to pass on the validity of the decree despite the state of the record.

## III

I agree that, in light of this Court's recent decisions, one portion of the Michigan decree—that prohibiting the union from controlling the fees charged by attorneys— cannot stand. In *United Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217 (1967), the Court held that as a matter of federal constitutional law a labor union is entitled to engage an attorney to represent its members in matters of collective interest, free of direct financial charge to them. While I believed then and still believe that this was an unsound piece of constitutional adjudi-

cation, I am unable to distinguish the facts of *Mine Workers* from those in the case at bar, where a union agreed with attorneys as to the maximum fee to be charged its members in matters of collective interest. Despite the Brotherhood's prior acquiescence in the decrees in Virginia and other States, I find the unforeseeable change in the law wrought by the *Mine Workers* decision sufficient to justify relieving it from the consequences of taking that position. See Restatement of Judgments § 70 (1942); 1B J. Moore, Federal Practice ¶ 0.448 (1965). I therefore concur in the Court's vacating this portion of the Michigan decree. In all other respects I think the decree is consistent with our past decisions and otherwise valid.

The first portion of that decree prohibits the Brotherhood from "giving or furnishing legal advice to its members or their families." I do not understand that the Court's "commonsense" approach to the First Amendment extends to the point that laymen are constitutionally entitled to give legal advice to other laymen. I think it plain that the provision was intended to prohibit *only* such conduct. It is manifestly based on the Virginia decree, where the corresponding provision was supported by the chancellor's finding that "[i]n furtherance of the plan the defendant Brotherhood has advised, and continues to advise, its members and the families of deceased members with respect to the legal aspects of their claims." 207 Va., at 183 n. 1, 149 S. E. 2d, at 266 n. 1. The provision is also related to the prohibition in the 1962 Michigan decree against "[t]elling any person or his representatives that said person has a cause of action, the amount he is entitled to recover, where suit should be filed, or doing any other act or thing which constitutes the practice of law within the State of Michigan." App. 117. I therefore can only consider fanciful the Court's suggestion that the "plain meaning" of this prohibition "would

emphatically deny the right of the Union to employ counsel to represent its members." *Ante,* at 581. In any event, if there is any ambiguity in the decree the appropriate course is to clarify it, not to strike it down.

The second provision of the decree, prohibiting the Brotherhood from furnishing attorneys with information about accidents and the names and addresses of injured workers, orders it to refrain from conduct that it averred but did not prove had been terminated. Nothing in our prior decisions approves the solicitation of business by lawyers except insofar as the solicitation may be correlative to the rights of the clients. See *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U. S., at 8. There is no reason in terms of First Amendment interests why the Brotherhood should not be obliged to give the results of its investigations to the injured person to take to whatever lawyer he chooses rather than for the Brotherhood to give it to the lawyer it prefers. The provision is plainly appropriate as a means of ensuring that the injured workman has a truly free choice. In effect this provision of the decree is designed to fend against "ambulance chasing," an activity that I can hardly suppose the Court thinks is protected by the First Amendment.

Another provision of the decree prohibits the Brotherhood and its members from "stating or suggesting that a recommended lawyer will defray expenses of any kind or make advances for any purpose to such injured persons or their families pending settlement of their claim." I think it a close question whether the conduct thus proscribed is protected under this Court's opinion in *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar, supra.* As petitioner admits, while it is not generally improper for an attorney to make advances to clients, it is considered improper for him to use the fact that he makes them as a drawing card

in an effort to secure professional employment. At the same time, there is no contention made that the representation thus proscribed is inaccurate, and misapprehension on this score may well be the determinative factor in an injured man's decision not to seek legal advice in connection with his claim. On balance, I conclude that the equities do not call for relieving petitioner of its considered decision to acquiesce in this portion of the Virginia decree and the corresponding portions of consent decrees entered in other States.

The remaining provisions of the decree prohibit the Brotherhood from sharing in legal fees or recoveries, and prohibit the members from accepting compensation for solicitation of business for a lawyer. These provisions are entirely appropriate to remove any temptation for the representatives of the Brotherhood to overbear the injured man's choice of legal representation. They prohibit conduct which has long been considered unethical, and which in no significant way advances the interests that the Court's prior decisions in this field sought to protect. I see no basis whatever for striking down these provisions of the decree.[8]

---

[8] The Brotherhood explicitly admitted in its answer that its members had in the past received compensation from regional counsel for services in furnishing clients, App. 17, and the opinion of the Illinois Supreme Court, on which the Brotherhood relied, detailed the manner in which regional counsel were required to support the Brotherhood's Legal Aid Department. See *supra*, at 587. This scheme was the end product of an evolution from more direct forms of fee splitting, a process described in *Hulse* v. *Brotherhood of Railroad Trainmen*, 340 S. W. 2d 404, 408–409 (Mo. 1960). The court below, having found the evil in a matured form, was entitled to proscribe as well the straightforward manifestation in which it had begun. Moreover, it is well settled that a court of equity, like an administrative agency, "cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *FTC* v. *Ruberoid*

For these reasons I would sustain the judgment of the Michigan Supreme Court, with the exception already noted for the prohibition on controlling the fees charged by any lawyer. However, it is appropriate for me to make a few general remarks in closing. I share my Brothers' concern with the problems of providing meaningful access to competent legal advice for persons in the middle and lower economic strata of our society. This is a matter of public concern deserving our best efforts at resolution, a task that the organized bar may be thought to have been too slow in recognizing. Nor do I condone, any more than my Brethren, the nefarious practices that called forth the Brotherhood's plan before us today.

But the issue presented for decision is not the desirability of group legal services, or the ways in which the traditional concepts of professional ethics should be modified to take account of the changes in social structure and social needs since the 19th century. The issue, rather, is the scope left by the Federal Constitution for state action in the regulation of the practice of law. Despite the First Amendment implications of denial of access to the courts in other situations, see *NAACP* v. *Button*, 371 U. S. 415, 452–455 (1963) (dissenting opinion), all that is involved here is a combination of purchasers of services seeking to increase their market power. The relationship to First Amendment interests seems to me remote at best. Cf. *Associated Press* v. *United States*, 326 U. S. 1, 19–20 (1945). Recognizing that a majority of my Brethren felt otherwise in *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar*, 377 U. S. 1 (1964), and *United Mine Workers* v. *Illinois Bar*

*Co.,* 343 U. S. 470, 473 (1952) (footnote omitted). See, *e. g., Local 167* v. *United States,* 291 U. S. 293 (1934); *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436 (1940); *United States* v. *National Lead Co.,* 332 U. S. 319 (1947).

*Assn.,* 389 U. S. 217 (1967), I accept their conclusion. I would not, however, extend those cases further than is required by their logic. Accordingly, with the one exception noted, I would affirm the judgment below.

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACKMUN joins, concurring in part and dissenting in part.

The first provision in the decree prohibiting the union from giving or furnishing legal advice to its members or their families is overbroad in light of *United Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217 (1967), and should be narrowed to prohibit only legal advice by nonlawyers. Also, I agree with the Court that the portion of the decree forbidding the setting of fees by union-lawyer agreement cannot stand. Otherwise, however, I do not read the decree as being inconsistent with our prior cases and I would not now extend them to set aside this decree in its entirety.