362 So.2d 489 (1978)
William Travis ALLISON, Paula A. Perrone and Allison and Perrone (a Professional Law Corporation)
v.
LOUISIANA STATE BAR ASSOCIATION.
No. 61047.
Supreme Court of Louisiana.
September 5, 1978.
William Travis Allison, New Orleans, for plaintiffs-relators.
Chris J. Roy, Celia R. Cangelosi, Gravel, Roy & Burnes, Alexandria, for defendant-respondent.
DIXON, Justice.
Petitioners William Travis Allison, Paula A. Perrone and Allison and Perrone (A Professional Law Corporation) brought this action under this court's original jurisdiction (La.Const. of 1974, Art. 5, § 5(B)) seeking to enjoin the defendant Louisiana State Bar Association from enforcing certain disciplinary rules which prohibit the soliciting, marketing and providing of prepaid legal services offered by the petitioners to various business groups.
William Travis Allison and Paula A. Perrone formed a division of the Allison and Perrone law corporation designated "Employees' Legal Plan" (ELP). According to the petition to this court, the purpose of the division was to "formulate and market systems of prepaid legal services to selected employee groups in the State of Louisiana." On August 19, 1977 petitioners mailed to certain New Orleans employers a letter describing the services offered and enclosed a brochure designed for the education of the employees. On September 22, 1977 the petitioners *490 contracted with one of the employers; if 50% of the eligible employees subscribed, the employer agreed to withhold from their wages and remit to the lawyers $10.00 a month from each covered employee; the lawyers agreed to perform legal services specified in detail in the agreement. On September 26, 1977 the Committee on Professional Responsibility, Louisiana State Bar Association, notified petitioners by mail that an investigation of their potential violations of DR 2-103 of the Code of Professional Responsibility had commenced. The petition was then filed in this court on November 18, 1977.
Petitioners argue that the threatened enforcement of DR 2-103(A), DR 2-103(D)(4) and DR 2-103(D)(4)(b) of the Code of Professional Responsibility has had a "chilling effect" on their rights secured by the First and Fourteenth Amendments to the United States Constitution and that those rules governing professional conduct are unconstitutional.
The rules under attack read as follows:
"DR 2-103. Recommendation of Professional Employment.
(A) A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer.
(B) A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2-103(D).
. . . . .
(D) A lawyer shall not knowingly assist a person or organization that furnishes or pays for legal services to others to promote the use of his services or those of his partner or associate or any other lawyer affiliated with him or his firm except as permitted in DR 2-101(B). However, this does not prohibit a lawyer or his partner or associate or any other lawyer affiliated with him or his firm from being recommended, employed or paid by, or cooperating with, one of the following offices or organizations that promote the use of his services or those of his partner or associate or any other lawyer affiliated with him or his firm if there is no interference with the exercise of independent professional judgment in behalf of his client:
. . . . .
(4) Any bona fide organization that recommends, furnishes or pays for legal services to its members or its beneficiaries provided the following conditions are satisfied:
(a) Such organization, including any affiliate, is so organized and operated that no profit is derived by it from the rendition of legal services by lawyers, and that, if the organization is organized for profit, the legal services are not rendered by lawyers employed, directed, supervised or selected by it except in connection with matters which such organization bears ultimate liability of its member or beneficiary.
(b) Neither the lawyer, nor his partner, nor associate, nor any other lawyer affiliated with him or his firm, nor any non-lawyer, shall have initiated or promoted such organization for the primary purpose of providing financial or other benefit to such lawyer, partner, associate or affiliated lawyer.
(c) Such organization is not operated for the purpose of procuring legal work or financial benefit for any lawyer as a private practitioner outside of the legal services program of the organization.
(d) The member or beneficiary to whom the legal services are furnished, and not such organization, is recognized as the client of the lawyer in the matter.
(e) Any member or beneficiary who is entitled to have legal services furnished or paid for by the organization may, if such member or beneficiary so desires, select counsel other than that furnished, selected or approved by the organization *491 for the particular matter involved; and the legal service plan of such organization provides appropriate relief for any member or beneficiary who asserts a claim that representation by counsel furnished, selected or approved would be unethical, improper or inadequate under the circumstances of the matter involved and the plan provides an appropriate procedure for seeking such relief.
(f) The lawyer does not know or have cause to know that such organization is in violation of applicable laws, rules of court and other legal requirements that govern its legal service operations.
(g) Such organization has filed with the appropriate disciplinary authority at least annually a report with respect to its legal service plan, if any, showing its terms, its schedule of benefits, its subscription charges, agreements with counsel, and financial results of its legal service activities or, if it has failed to do so, the lawyer does not know or have cause to know of such failure."
Petitioners argue that the above rules infringe upon their freedom of speech in that they are prevented from actively soliciting business for their "Employees' Legal Plan." In support of their argument the petitioners rely on several United States Supreme Court cases.
In the first case cited by petitioners, N.A. A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), the N.A.A.C.P. challenged certain Virginia laws which banned the solicitation of legal services. The Virginia Conference of the N.A.A.C.P. devised a plan by which persons who had potential legal actions raising questions of racial discrimination would be referred by the Conference to a N.A.A.C.P. legal staff of fifteen attorneys. The Conference would then pay all of the expenses arising out of the case, usually including the fees for each of the lawyers involved.
The Supreme Court first dismissed the contention that "solicitation" may not be among the freedoms protected by the First Amendment:
". . . To this contention there are two answers. The first is that a State cannot foreclose the exercise of constitutional rights by mere labels. The second is that abstract discussion is not the only species of communication which the Constitution protects; the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion. Thomas v. Collins, 323 U.S. 516, 537, 65 S.Ct. 315, 325, 89 L.Ed. 430, 444; Herndon v. Lowry, 301 U.S. 242, 259-264, 57 S.Ct. 732, 81 L.Ed. 1066, 1075-1078. Cf. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117,1123, 73 A.L.R. 1484; Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131, 1134. In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression.. . .
. . . . .
The NAACP is not a conventional political party; but the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society. For such a group, association for litigation may be the most effective form of political association." 371 U.S. at 429, 83 S.Ct. at 336, 337, 9 L.Ed.2d at 416, 417. (Emphasis added).
The court then examined the interests advanced by the state in support of its ban against solicitation and, finding none which justified the impairment of N.A.A.C.P.'s rights to political expression, held:
". . . the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth *492 Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business . . ." 371 U.S. at 428-429, 83 S.Ct. at 335, 9 L.Ed.2d at 415.
A year after Button the United States Supreme Court was presented with a case in which an organization not involved in the advancement of civil rights solicited legal assistance for its members. In that case, Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), the Brotherhood set up a "Legal Aid Department" which endeavored to refer injured workers or their widows to individual lawyers in the area who had been determined by the Brotherhood to be the best to consult.
The court described the Brotherhood's constitutional interests in the referral system as follows:
"It cannot be seriously doubted that the First Amendment's guarantees of free speech, petition and assembly give railroad workers the right to gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them in the Safety Appliance Act and the Federal Employers' Liability Act, statutory rights which would be vain and futile if the workers could not talk together freely as to the best course to follow. The right of members to consult with each other in a fraternal organization necessarily includes the right to select a spokesman from their number who could be expected to give the wisest counsel. That is the role played by the members who carry out the legal aid program. And the right of the workers personally or through a special department of their Brotherhood to advise concerning the need for legal assistanceand, more importantly, what lawyer a member could confidently rely on is an inseparable part of this constitutionally guaranteed right to assist and advise each other." 377 U.S. at 5-6, 84 S.Ct. at 1116, 12 L.Ed.2d at 93.
To the state's argument that its interest in regulating the affairs of the legal profession justified the prohibition of this activity, the high court responded:
"Virginia undoubtedly has broad powers to regulate the practice of law within its borders; but we have had occasion in the past to recognize that in regulating the practice of law a State cannot ignore the rights of individuals secured by the Constitution. For as we said in NAACP v. Button, supra, 371 U.S. at 429, 83 S.Ct. 336, 9 L.Ed.2d 405, `a State cannot foreclose the exercise of constitutional rights by mere labels.' Here what Virginia has sought to halt is not a commercialization of the legal profession which might threaten the moral and ethical fabric of the administration of justice. It is not `ambulance chasing.' The railroad workers, by recommending competent lawyers to each other, obviously are not themselves engaging in the practice of law, nor are they or the lawyers whom they select parties to any soliciting of business. . ." 377 U.S. at 6-7, 84 S.Ct. at 1116-1117, 12 L.Ed.2d at 93. (Emphasis added).
The Supreme Court, finding the state's intrusion into the association's First Amendment rights unjustified, held it unconstitutional.
In United Mine Workers v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), the U.M.W. challenged state prohibition of a system devised by the union through which members were provided legal counsel by a salaried union attorney. After discussing the First Amendment guarantees involved, the Supreme Court decided that the issue was governed by the Button and Trainmen cases, supra:
"The foregoing were the principles we invoked when we dealt in the Button and Trainmen cases with the right of an association to provide legal services for its members. That the States have broad power to regulate the practice of law is, of course, beyond question. See Trainmen, supra, 377 U.S., at 6, 84 S.Ct. 1113, *493 12 L.Ed.2d at 93, 11 A.L.R.3d 1196. But it is equally apparent that broad rules framed to protect the public and to preserve respect for the administration of justice can in their actual operation significantly impair the value of associational freedoms. . . .
We think that both the Button and Trainmen cases are controlling here. The litigation in question is, of course, not bound up with political matters of acute social moment, as in Button, but the First Amendment does not protect speech and assembly only to the extent it can be characterized as political. `Great secular causes, with small ones, are guarded. The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest.' Thomas v. Collins, supra, 323 U.S. at 531, 65 S.Ct. 315, 89 L.Ed. at 441. And of course in Trainmen, where the litigation in question was, as here, solely designed to compensate the victims of industrial accidents, we rejected the contention made in dissent, see 377 U.S. at 10, 84 S.Ct. 1113, 12 L.Ed.2d at 95, 11 A.L.R.3d 1196 (Clark, J.), that the principles announced in Button were applicable only to litigation for political purposes. See 377 U.S., at 8, 84 S.Ct. 1113, 12 L.Ed.2d at 94, 11 A.L.R.3d 1196." 389 U.S. at 222-223, 88 S.Ct. at 356-357, 19 L.Ed.2d at 430-431.
Accordingly, the court held that the restrictions were violative of the constitutional rights of the union members.[1]
Finally, the petitioners rely on Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). In Bates, the Supreme Court held for the first time that prohibitions against the advertisement of routine legal services constitute a denial of the attorney's First Amendment rights. In so holding the court found that the traditional justifications offered for the ban on advertising were insufficient to justify the infringement upon the rights of the individual attorneys.
We find each of the cases relied upon by the petitioners to be distinguishable from the facts and issues presented in the instant case. Two recent cases from the Supreme Court point out the distinguishing factors. The cases, Ohralik v. Ohio State Bar Association, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) and In Re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), were companion cases dealing with different aspects of state bans against solicitation.
Ohralik involved an Ohio attorney who had been disciplined by the state bar association for violating disciplinary rules which prohibited direct solicitation.[2] The violation occurred when Ohralik, having heard of an automobile accident, visited both of the victims, informed them of their potential legal rights, and solicited employment.
The court first described the nature of the constitutional right involved and the degree of judicial scrutiny to be accorded regulations of that interest:
"Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection only recently. In rejecting the notion that such speech `is wholly outside the protection of the First Amendment,' Virginia Pharmacy [Virginia Pharmacy Board v. Virginia Consumer Council], 425 U.S. [748], at 761, 96 S.Ct. 1817, 48 L.Ed.2d 346, we were careful not to hold `that it is wholly undifferentiable from other froms' (sic) of speech. Id., at 771 n. 24, 96 S.Ct. 1817. We have not discarded the `commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. Ibid. To require a *494 parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.
. . . . .
In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component. While this does not remove the speech from the protection of the First Amendment, as was held in Bates and Virginia Pharmacy, it lowers the level of appropriate judicial scrutiny." 436 U.S. at 455, 98 S.Ct. at 1918, 56 L.Ed.2d at 453.
The court then distinguished the interests involved from those presented in Bates, supra, and the Button series of cases, supra:
". . . Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual. The admonition that `the fitting remedy for evil counsels is good ones' is of little value when the circumstances provide no opportunity for any remedy at all. In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the `availability, nature, and prices' of legal services, cf. Bates, supra, 433 U.S. at 364, 97 S.Ct. 2691; it actually may disserve the individual and societal interest, identified in Bates, in facilitating `informed and reliable decisionmaking.' Ibid.
. . . . .
Appellant does not contend, and on the facts of this case could not contend, that his approaches to the two young women involved political expression or an exercise of associational freedom, `employ[ing] constitutionally privileged means of expression to secure constitutionally guaranteed civil rights.' NAACP v. Button, 371 U.S. 415, 442, 83 S.Ct. 328, 9 L.Ed.2d 416 (1963); see In re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417. Nor can he compare his solicitation to the mutual assistance in asserting legal rights that was at issue in United Transportation Union v. Michigan Bar, 401 U.S. 576,91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); Mine Workers v. Illinois Bar Assn., 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); and Railroad Trainmen v. Virginia Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation. See Button, supra, 371 U.S. at 439-443, 83 S.Ct. 328, 9 L.Ed.2d 416. While entitled to some constitutional protection, appellant's conduct is subject to regulation in furtherance of important state interests." 436 U.S. at 457, 98 S.Ct. at 1919, 56 L.Ed.2d at 454.
The court found the state interests involved to be substantial. Among those described by the court were the interest in the maintaining of high standards among the members of a licensed profession, the prevention of overreaching and the exertion of undue influence on lay persons, the protection of privacy and the prevention of situations in which the lawyer's judgment may be clouded by his pecuniary interest. The court noted:

*495 ". . . The rules prohibiting solicitation are prophylactic measures whose objective is the prevention of harm before it occurs. The rules were applied in this case to discipline a lawyer for soliciting employment for pecuniary gain under circumstances likely to result in the adverse consequences the State seeks to avert. In such a situation, which is inherently conducive to overreaching and other forms of misconduct, the State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful solicitation by lawyers whom it has licensed." 436 U.S. at 464, 98 S.Ct. at 1923, 56 L.Ed.2d at 458.
The holding of Ohralik was stated as follows:
". . . The Baracting with state authorizationconstitutionally may discipline a lawyer for. soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent, . . ." 436 U.S. at 449, 98 S.Ct. at 1915, 56 L.Ed.2d at 449.
In the companion case, In Re Primus, supra, the court was presented with a situation which it determined to be akin to that presented in the Button series of cases. Edna Smith Primus, an attorney associated with the American Civil Liberties Union, was disciplined under state bar association rules for contacting women who had been sterilized or threatened with sterilization as a condition of their continued participation in a "Medicaid" program, and offering her legal services in the advancement of their rights.
The court quickly distinguished the case from its companion:
"Unlike the situation in Ohralik, however, appellant's act of solicitation took the form of a letter to a woman with whom appellant had discussed the possibility of seeking redress for an allegedly unconstitutional sterilization. This was not in-person solicitation for pecuniary gain. Appellant was communicating an offer of free assistance by attorneys associated with the ACLU, not an offer predicated on entitlement to a share of any monetary recovery. And her actions were undertaken to express personal political beliefs and to advance the civil-liberties objectives of the ACLU, rather than to derive financial gain. The question presented in this case is whether, in light of the values protected by the First and Fourteenth Amendments, these differences materially affect the scope of state regulation of the conduct of lawyers." 436 U.S. at 422, 98 S.Ct. at 1899, 56 L.Ed.2d at 428.
Instead of the minimal First Amendment freedoms involved in the Ohralik situation, the court found that the ACLU interests and those represented by Primus' actions were those partaking of the broad rights to freedom of association and political expression. The court then stated:
"Where political expression or association is at issue, this Court has not tolerated the degree of imprecision that often characterizes government regulation of the conduct of commercial affairs. The approach we adopt today in Ohralik, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444, that the State may proscribe in-person solicitation for pecuniary gain under circumstances likely to result in adverse consequences, cannot be applied to appellant's activity on behalf of the ACLU. Although a showing of potential danger may suffice in the former context, appellant may not be disciplined unless her activity in fact involved the type of misconduct at which South Carolina's broad prohibition is said to be directed." 436 U.S. at 434, 98 S.Ct. at 1906, 56 L.Ed.2d at 436.
Under this analysis, the Supreme Court held that the bar association could not constitutionally discipline Primus for her activities.
From the above cases we can make these observations. First, the state has an undeniable interest in the regulation of the legal profession. Whether that interest is sufficient to justify an infringement upon First Amendment freedoms, however, depends upon the nature of the First Amendment *496 right asserted and the evil sought to be avoided by the regulation. In cases involving the substantial rights to associate for the advancement of a common purpose, the state's interest in regulating the "solicitation" attending that association will generally be deemed insufficient to sustain the abridgment of the First Amendment rights. On the other hand, because of the substantial dangers associated with direct, in-person solicitation for pecuniary gain, the state's interest in "prophylactic" regulation justifies the limitation upon the lawyer's activities.
It is not the right of individuals to join and associate for the improvement of the common lot which is involved in this action, but rather it is the asserted right of the individual attorney to form such a group for the advancement of his own interests.
Petitioners did not engage in face-to-face solicitation with would-be clients, as did Ohralik. They wrote an employer, soliciting the formation of a contract under which the employer collected money from wages and sent it to petitioners, who promised to perform specified legal services for those who paid. The solicitation by mail was not fraught with as many undesirable possibilities as face-to-face solicitation, but it was direct solicitation, nevertheless. And because the offer was privately made, and not in the public domain like the advertising approved in the Bates case, for all to see, it would be more difficult to regulate to prevent abuses which are legitimate subjects of state regulation, in spite of some First Amendment involvement (but less difficult to regulate than face-to-face solicitationsee Primus).
In the Primus case the solicitation was by letter to a woman who had been sterilized by a doctor, suggesting a consultation about proposed litigation which the American Civil Liberties Union wanted to bring, at no cost to the victim. "This was not in-person solicitation for pecuniary gain." In re Primus, supra, 436 U.S. at 422, 98 S.Ct. at 1899, 56 L.Ed.2d at 428. The solicitation was interpreted as volunteering free legal services to express personal political beliefs and to advance civil liberties objectives of the ACLU, rather than to derive financial gain.
The necessary inference from the opinion in the Primus case is that the result would have been different if the lawyer's income was dependent on the outcome of the litigation.
Only in a general, socially conscious way do petitioners justify their plan as anything but a source of economic benefit for themselves; they argue that people who need it most cannot obtain legal services at reasonable cost, and their plan will make it possible. We have no difficulty in concluding that financial benefits for petitioners is at least an important motive for the solicitation. Since we interpret petitioners' actions as direct solicitation for pecuniary gain, and since we find the State's traditional and important regulation of the practice of law by prohibiting solicitation would have no adverse impact upon constitutional rights (except the lawyer's own right to speak as he pleases in commercial solicitation) the prohibition against direct solicitation by lawyers for pecuniary gain will be upheld.
Petitioners' demands are rejected and the petition is dismissed, at their cost.
TATE, J., concurs and assigns reasons.
TATE, Justice, concurring.
The writer concurs with very grave reservations.
I agree with much of the thoughtful majority opinion, including with its reconciliation of the United States Supreme Court decisions in Bates, Ohralik, and Primus. Nevertheless, in my view the Bates rationale more nearly applies than does Ohralik to the plan of the petitioners to solicit employer groups to set up prepaid legal-service plans for their employees. The proposed plan shows that the solicitation will be by mail, in a restrained and dignified explanation of the plan to be offered.
The organized bar has a valid interest in regulating direct person-to-person solicitation *497 and in protecting the public against a one-sided presentation and uniformed retaining-decision by prospective clients. See Ohralik. On the other hand, a lawyer-regulation (although ostensibly designed to advance this professional interest) falls afoul of the First Amendment if it unreasonably restricts society's interest in the free flow of commercial information (and the supplier's First Amendment right to communicate the availability of his services); for, in America's free-market economy, the "advertisement" by a supplier is the traditional mechanism by which potential purchasers are informed of the availability of services or products and enabled to take advantage of them. See Bates.
In my view, the professional interest of the organized bar (Ohralik) is outweighed by the First Amendment values favoring society in general and the petitioners in particular (Bates):
The latter's proposal involves communication of socially desirable legal services (a prepaid insurance for middle-income employees) which the organized bar has (in my opinion) no constitutionally supportable reason for prohibiting per se. I do not see Ohralik objections to the petitioner's proposed method of communicating this plan to a selected and sophisticated portion of the commercial public, by a restrained and dignified "advertising" means best available for the purposea mail solicitation, in this case, rather than advertising in public journals.
Ultimately, however, I do not dissent from the majority holding. I agree that Bates et al do not as yet compel us to extend free-communication rights this slight step further (although it does not take the eye of a prophet to discern that the United States Supreme Court may soon itself take this step). Also, I defer to the wisdom of my brethren in not examining at this time whether the protection of free speech by our own state constitution, Article 1, Section 7, perhaps broader than the federal First Amendment, might not require a different result.
In general, the adjustment of competing political and economic values should take place within the social institutions in which they interact, not in a courtroom as a result of judicial fiat. This is subject to the caveat that the decision-making apparatus of society does not infringe upon the constitutional protection of each individual against unreasonable governmental restriction to speak or act as he will.
Whether this caveat applies is the issue before us, of course. Giving deference to the presumption of constitutionality of the lawyer-regulation attacked, I am unwilling at present to disagree with my brethren that the federal constitution as yet requires us to invalidate it.
I do agree that, as written, the Code of Professional Responsibility, adopted by this court on recommendation of the organized bar, required the bar association to disapprove of the efforts of the petitioners.
The presentations and my study in this matter likewise impel me to suggest that this court and the organized bar should seriously study modifications of our Code so as to permit approval of the offer of socially desirable prepaid legal-service plans (which will expand the range of legal services practicably available to the people we serve), such as the presentwith (if thought advisable) prior approval of bar committees based upon reasonable regulation as to the nature of the services to be offered, and as to the experience and competence of the personnel who will offer the services.
Whether or not it has yet been held that the federal or state constitution requires it, it seems to me that the legal profession itself (and this court, with its constitutional responsibility to regulate the Louisiana legal profession) should recognize the public interest in having available this type of prepaid legal service, which may make practicably more possible our service to many members of the community who will not otherwise take advantage of the counsel and help of an attorney that should be (but may not otherwise be) known by them as readily available.
*498 With the reservations here expressed, I respectfully concur.
NOTES
[1] See also the similar case of United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971).
[2] The disciplinary rules at issue in Ohralik are identical to DR 2-103(A) and DR 2-104(A)(1) of the Louisiana Code of Professional Responsibility.