648

BROOKINS, Louise, Executive Director and Trustee Ad Litem for the Philadelphia Welfare Rights Organization, on behalf of its members, clients and itself, Appellant,

v.

O'BANNON, Helen, Individually and in her official capacity as Secretary of the Pennsylvania Department of Public Welfare, and Don Jose Stovall, Individually and in his official capacity as the Executive Director of the Philadelphia County Board of Assistance, Appellees.

No. 82–1380.

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 1982.

Decided Feb. 4, 1983.

As Amended Feb. 17, 1983.

Stephen F. Gold (argued), Paul Bender, Philadelphia, Pa., for appellant.

Leroy S. Zimmerman, Atty. Gen., Andrew S. Gordon (argued), Allen C. Warshaw, Deputy Attys. Gen., Harrisburg, Pa., for appellees.

Before ADAMS and GARTH, Circuit Judges, and GERRY,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to determine whether a clause rendering two provisions of the 1982 Pennsylvania Welfare Reform Act nonseverable, infringes the first amendment rights of expression, petition, and association of the Philadelphia Welfare Rights Organization ("WRO") or its members. The district court denied WRO's motion for preliminary injunctive relief and then entered final judgment for defendants. Because we conclude that the 1982 Welfare Reform Act does not chill any rights of expression or association of WRO or its members, and does not restrict their access to the courts, we affirm.

### I.

The 1982 amendments to the Pennsylvania Public Welfare Code, Act No. 1982–75, 1982 Pa.Laws 231, redistribute a portion of the State's welfare aid from the class of needy persons as a whole, to a smaller subclass of the "chronically needy." Three provisions of the 1982 amendments responsible for this shift in welfare assistance are relevant to this appeal. Section 10 of the Welfare Reform Act classifies the recipients of welfare as either "chronically needy" or "transitionally needy"[1] and provides for aid

---

* Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

1. Section 10 of the Act provides in pertinent part:

(i) *Chronically needy persons* are those persons chronically in need who may be eligible for an indeterminate period as a result of medical, social or related circumstances and shall be limited to:

(A) A child who is under age eighteen or who is attending a secondary or equivalent vocational or technical school full-time and may reasonably be expected to complete the program before reaching age nineteen.

(B) A person who is over forty-five years of age.

(C) A person who has a serious physical or mental handicap which prevents him or her from working in any substantial gainful activity as determined in accordance with standards established by the department....

(D) A person who is a caretaker. This category of persons shall include persons whose presence is required in the home to

to the transitionally needy for only one ninety-day period each year.[2] Section 20(a) of the Act increases general welfare assistance to "assistance units" of three or more persons by five percent,[3] thereby augmenting the funds allocable to the chronically needy by a portion of the funds formerly allocated to the "transitionally needy."

A third provision, section 20(b), makes the enforceability of section 20(a) depend on the enforceability of section 10. Section 20(b) provides that "[i]f the department is prevented by court order from implementing the provisions of section 10 of this amendatory act, the provisions of [section 20(a)] shall be suspended and shall not take effect until the provisions of section 10 are implemented."[4] Section 10, in short, divides welfare recipients into "chronically needy" and "transitionally needy" classes and, in so doing, reduces the benefits of the transitionally needy. Section 20(a) increases benefits for all needy persons—chronically and transitionally needy—provided that

they are members of "assistance units" of three or more persons. Section 20(b) "suspends" the operation of section 20(a) in the event that the section 10 categories of "chronically" and "transitionally" needy, are not given effect.

Therefore, as we understand the statutory scheme, the Act creates no difference in benefit levels between the transitionally needy and chronically needy for ninety days. During this period, both classes of welfare recipients will continue to receive benefits at earlier-established levels, augmented by five percent if the assistance unit consists of three or more persons. After ninety days, chronically needy persons will continue receiving benefits as before. Transitionally needy persons, however, will receive no benefits at all until the following year.

The language of section 20(b) and its legislative history indicate plainly that the Pennsylvania legislature intended to fund the five percent benefit increase of section

care for another person as determined in accordance with department regulations.

(E) A person suffering from drug or alcohol abuse who is currently undergoing active treatment in an approved program. No individual shall qualify as chronically needy under this clause for more than nine months.

(F) A person who is employed full-time and who does not have earnings in excess of current grant levels.

(G) Any person who is ineligible for unemployment compensation and whose income falls below the assistance allowance level as a result of a natural disaster as determined by the department.

(H) Any person who has previously been employed full time for at least forty-eight months out of the previous eight years and has exhausted his or her unemployment compensation benefits prior to applying for assistance.

(I) Any person who does not otherwise qualify as chronically needy, and who is receiving general assistance on the date this section is enacted into law and who has not refused a bona fide job offer or otherwise failed to comply with all employment requirements of this act and regulations promulgated thereunder....

(iii) *Transitionally needy persons* are those persons who are otherwise eligible for general assistance but do not qualify as chronically needy....

Act 1982–75, § 10, 1982 Pa.Laws 231, 236–38 (to be codified at Pa.Stat.Ann. tit. 62, § 432(3)) (emphasis added).

2. Sections 10(ii) and 10(iii) of the Act provide in part:

(ii) Assistance for *chronically needy persons* shall continue as long as the person remains eligible....

(iii) ... Assistance for *transitionally needy persons* shall be authorized only once in any twelve-month period in an amount not to exceed the amount of ninety days' assistance.

Act 1982–75, § 10(ii), (iii), 1982 Pa.Laws 231, 238 (to be codified at Pa.Stat.Ann. tit. 62, § 432(3)) (emphasis added).

3. Section 20 of Act 1982–75, 1982 Pa.Laws 231, 247 (to be codified at Pa.Stat.Ann. tit. 62, § 475), provides in full:

(a) On July 1, 1982, the Department of Public Welfare shall raise general assistance and aid to families with dependent children allowances for assistance units of three or more persons by an average of at least five percent.

(b) If the department is prevented by court order from implementing the provisions of section 10 of this amendatory act, the provisions of this section shall be suspended and shall not take effect until the provisions of section 10 are implemented.

4. *See* note 3 *supra.*

20(a) from cost savings attributable to section 10 and, more particularly, did not intend to raise benefits to any welfare recipients, regardless of category, unless those cost savings were realized.[5] For the purposes of the preliminary injunction motion, the parties stipulated that the cost savings for the fiscal year 1982–83 which would result from section 10 were $48 million. The increase in benefits to those welfare recipients to whom section 20 applied for the year 1982–83 would be $13 million.

### A.

WRO brought this action on May 12, 1982, on behalf of itself and its members under 42 U.S.C. § 1983 (1976), seeking to declare section 20(b) of the Act unconstitutional. WRO claimed that section 20(b) penalized the exercise of WRO's "right to request a court to invalidate Section 10 of the statute."[6] WRO moved at the same time for preliminary injunctive relief against the enforcement of section 20(b), then scheduled to take effect in June of 1982. For the purposes of that motion for preliminary relief, the parties stipulated that section 20(b) "prevented" WRO from asserting the rights of its members to challenge section 10 and from advocating that they do so.[7]

The district court properly noted that WRO must establish, if preliminary injunctive relief were to be granted, a reasonable probability of success on the merits and the existence of irreparable injury. *See Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir. 1980); *Constructors Ass'n of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978). Finding no likelihood of success on the merits, the district court considered it unnecessary to reach the question of irreparable harm. The district court appears to have concluded that section 20(b) did not chill the first amendment rights of either WRO as an organization or its members.

As an organization, the district court reasoned, WRO faced the dilemma of every organization representing a group of persons with conflicting interests: the group "must make a choice, unpleasant as it may be, as to its priorities, a situation not uncommon to any organization." *Brookins v. O'Bannon,* 550 F.Supp. 30, 32 (E.D.Pa.1982). The district court concluded that this "unpleasant choice" did not constitute a burden on the organization's first amendment rights.

As to the members of WRO (none of whom appears as a plaintiff) the court reasoned that no individual was deterred by section 20(b) from suing for welfare benefits. *"They* may go to court without jeopardy to *their* benefits." *Id.*

The district court therefore denied WRO's motion for injunctive relief and,

---

5. *See, e.g.,* the following colloquy between Representatives Punt and Richardson, reprinted in 1982 Pa.Legisl.Journal—House 721 (March 24, 1982):

Mr. RICHARDSON: The conference report is amended to delete the null-and-void proviso that stated that if any provision of this bill is prevented by a court order from being implemented by June 30, 1982, then the proposed grant increase would also be null and void. Could you explain that section, because I do not think that that is clear? It is not clear in my mind.

Mr. PUNT: We do not want to raid [the] State Treasury. We want to provide an increase in cash assistance allowance to the truly needy as long as those funds are there . . . .

6. Complaint ¶ 1. WRO maintained before the district court that section 20(b) constituted an unconstitutional penalty under both the first amendment and article III of the United States Constitution. WRO's article III claim averred that the nonseverability clause constituted a state regulation of federal jurisdiction. *See* Terral v. Burke Constr. Co., 257 U.S. 529, 532–33, 42 S.Ct. 188, 189, 66 L.Ed. 352 (1922); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 687–90 (2d ed. 1973). WRO abandoned this position on appeal. We express no opinion on the merits of this argument.

7. App. at 18–a, incorporating Complaint ¶ 18. We do not understand WRO to argue that it is in fact "prevented" from challenging section 10 or advocating that its members do so. WRO asserted in its brief, Appellant's Brief at 7, and in oral argument only that it was chilled or deterred from such activities, and we read the parties' stipulation in this light.

finding that there was no other evidence which WRO would introduce at trial, entered judgment for defendants.[8] This appeal followed.

### B.

WRO renews before this court the argument it raised below. That argument, as we understand it, consists of two parts: (1) WRO and its members have a first amendment right under *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and its progeny, to associate for the purpose of asserting rights of the "transitionally needy" against section 10; and (2) section 20(b) constitutes, under *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and its progeny, an unconstitutional penalty on the exercise of that right.[9]

### II.

Essentially, as we understand WRO's position, it is that section 20(b) of Act 75 (which suspends the five percent increase until the categories of chronically and transitionally needy are implemented) deters WRO and its members from litigating the constitutionality of section 10; that the Act thereby chills WRO's and its members' rights of political expression and association; and that, should WRO successfully challenge section 10, the Act would penalize WRO and some of its members for exercising their constitutional right to invoke the judicial process. Overall, the nub of WRO's complaint is that section 20(b) violates WRO's first amendment rights by restricting its access to the courts.

In response, the Commonwealth claims that the Act does not prevent WRO from obtaining any legal redress to which it believes it may be entitled, nor does the Act deter any member of WRO from challenging section 10.

In framing WRO's arguments which assert a violation of "plaintiff's rights of political expression and political association," Appellant's Brief at 7, we have attempted to sort out the constitutional bases on which each claim purportedly arises. In order to resolve these arguments, we believe that the Act must be analyzed in terms of its impact on those who WRO claims are affected by the statute.

### III.

■ The right to petition the courts, no less than the right to petition the legislative or administrative bodies, is protected by the first amendment. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). The freedom to associate for the purpose of exercising the right of petition is protected conduct as well. *See NAACP v. Button,* 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963). As the Court explained in *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958), "[e]ffective advocacy of both public and private points of view, particularly controversial cases, is undeniably enhanced by group association." In the context of this case, these Supreme Court authorities teach no more than the principle that "groups can unite to assert their legal rights." *United Transportation Union v. State Bar of Michi-*

---

**8.** WRO did not contest the fact that no other evidence would be produced.

**9.** The defendant Commonwealth has argued that WRO's injuries are speculative, unripe for adjudication, and therefore do not present a justiciable controversy under article III. This argument, sharing as it does some of the elements of a "standing" argument, originally focused our attention on this aspect of the Commonwealth's position.

Because the Commonwealth has agreed that WRO has standing, evidently having reached that conclusion on the basis of the stipulations made for the purposes of the preliminary injunction motion, we need not address that subject. We assume, without deciding, that *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982) would, in light of the stipulations on record here, sanction the standing of WRO to maintain this action. In like fashion, and with recognition of the stipulations into which the parties entered, we are unpersuaded by the Commonwealth's "ripeness" arguments. *Cf. Steffel v. Thompson,* 415 U.S. 452, 458–59, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974).

*gan,* 401 U.S. 576, 580, 91 S.Ct. 1076, 1079, 28 L.Ed.2d 339 (1971). Nor may the state "burden" or "abridge" those first amendment rights. *See Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972) (denial of official recognition without justification to association furthering personal beliefs "burdens or abridges that associational right"). In our view, the legislation enacted by the Commonwealth does no violence to these principles.

WRO does not charge that the Commonwealth has in fact "prohibited" WRO or any of its members from litigating. What the Act does do is, to provide that certain of WRO's members will lose a prospective five percent benefit increase if the classification scheme of section 10 is not implemented.[10] We must decide whether such a provision "burdens" or "abridges" the right of association. *Id.*

We discern three entities which might allege that section 20(b) burdens or abridges rights of expression and association: (1) the "chronically needy"; (2) the "transitionally needy"; and (3) WRO as an organization.

### A.

■ Does the Act prevent or deter the chronically needy from bringing an action which challenges the Act's validity? The chronically needy are not harmed by section 20(b) or by section 10. Indeed, to the extent they are eligible, rather than being harmed, the chronically needy are benefited by the five percent increase in benefits provided by these two sections of the Act. Because the chronically needy benefit by the operation of sections 10 and 20(a), we

can conceive of no reason nor of any incentive on their part to challenge the classification scheme of section 10. As a consequence, it seems patent that section 20(b) does not operate to deter the chronically needy from access to the judicial process.

The chronically needy may theoretically argue, however, that they may wish to associate with the transitionally needy for the general purpose of asserting their rights through litigation. *Cf. NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963). WRO would be the vehicle for this association. Such an argument, if made, would proceed along these lines: section 20(b) creates a conflict of interest between the transitionally needy and the chronically needy. This conflict, the chronically needy may assert, would tend to drive the chronically needy away from WRO as a litigating vehicle, if an attack were to be made on section 10 and were successful—because such a challenge would reduce by five percent the benefits of the chronically needy in assistance units of three or more persons. Conversely, if no attack on section 10 were to be made, the members of the transitionally needy would be alienated.

We do not find this indirect effect a burden on the associational rights of the chronically needy for the following reasons. First, nothing in the record suggests that the chronically or the transitionally needy have been, or will be, driven from WRO as a result of this conflict.[11]

Second, the Supreme Court has never held that the creation of a conflict of interest among the members of an organization,

---

**10.** The district court characterized the issue as follows:

> True, the "chronically needy" stand to lose their 5% increase *if* one of the "transitionally needy" successfully challenges Section 10 in court, but that does not constitutionally preclude the non-severability clause [section 20(b)]. Conflicting interests among members of an organization is [sic] inevitable. Merely because the Act may benefit some but not all members of the plaintiff organization does not mean that those dissatisfied with the Act's effect on them are chilled in the exercise of their First Amendment rights.

> *They* may go to court without jeopardy to *their* benefits. Similarly, WRO is not chilled from exercising its rights to represent its members; rather it must make a choice, unpleasant as it may be, as to its priorities, a situation not uncommon to any organization. *Brookins v. O'Bannon,* 550 F.Supp. 30, 32 (W.D.Pa.1982).

**11.** The stipulations of the parties contain no evidence of any needy person who has severed or intends to sever his or her relationship with WRO because of section 20(b).

"burdens" the associational rights of the organization's members. *NAACP v. Button, supra,* and the cases following it, essentially stand for the propositions that groups may associate together in order to assert their legal rights, and, that any action by the state which effectively prevents resort to the courts constitutes an impermissible burden and will not pass constitutional muster. Those cases do not hold that the creation of a situation (here the enactment of sections 10 and 20(b)) which makes one group unwilling to associate with another for the purposes of litigation, but which does not effectively prevent resort to the courts, results in a comparable burden.

Conflicts of the sort envisaged here are commonplace among members of a pluralistic society. We need not dwell on the many legislative classifications which may advantage or disadvantage members of an interest group. The Supreme Court has never held that such arrangements constitute a burden on rights of association—particularly when each of the purportedly affected groups is free to commence its own action in order to vindicate its rights—and we are not prepared to so hold here.

### B.

■ Nor can it be said that the transitionally needy are chilled or deterred by section 20(b) from bringing an action in court to enjoin section 10. As we understand the statute, *see* pp. 650–651 *supra,* the transitionally needy cannot be harmed by any litigation which they might institute; indeed, they could only benefit. If their challenge to section 10 should prove unsuccessful, no change in status or benefits would take place: the chronically needy would still have the benefit of section 20(a)

and receive a five percent increase if they belong to an assistance unit of three or more persons; and the transitionally needy would receive the same benefits, but limited to a period of ninety days each year.

On the other hand, if the transitionally needy successfully challenge section 10, then the present classification scheme of chronically and transitionally needy will be enjoined and, ostensibly, *all* needy, including the transitionally needy, will receive the benefits for which they were eligible prior to the enactment of Act 75. While it may be true that the chronically needy would suffer by that circumstance—in that its five percent increase for those in assistance units of three or more persons would be lost—it is obvious that section 20(b) does not constitute a deterrent to the transitionally needy.[12]

The transitionally needy could argue that, like the chronically needy, they are *indirectly* deterred from seeking judicial redress by the operation of section 20(b). This argument would track the argument claimed on behalf of the chronically needy: the transitionally needy may wish to associate with the chronically needy for the general purpose of asserting their rights through litigation. We find this argument just as unpersuasive here as we found it unpersuasive in the case of the chronically needy.

### C.

■ Having established that neither the chronically nor the transitionally needy have had their access to the courts restricted, we turn to a consideration of the argument of WRO in order to determine whether WRO has been denied a right of judicial redress.[13] WRO argues that the conflict created by section 20(b) among the interests

---

12. WRO asserts that the transitionally needy could be chilled from attacking section 10 if "relations or friends" were chronically needy and thereby injured by such a suit. Appellant's Brief at 30–31. No such facts have been alleged, and in light of the record on which this case has been argued, we reject such an argument. *See* Singleton v. Wulff, 428 U.S. 106, 113–16, 96 S.Ct. 2868, 2873–75, 49 L.Ed.2d 826 (1976); Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L.Rev. 423, 432 n. 50 (1974).

13. In our analysis of WRO's argument that it has been restricted in its right of access to the courts, we find no need to distinguish among WRO's claims of association and expression. WRO uses the right of petition as a means of expression and, for the purposes relevant here, associates with its members for the purpose of bringing litigation.

of WRO's members deters the organization from challenging section 10. This contention does not persuade us. Two arguments inform our view.

First, any burden on WRO created by this conflict is of the same nature as the alleged burdens discussed earlier, see p. 653 supra, with respect to the associational rights of the chronically and transitionally needy, and can no more constitute a burden on access to the courts within the meaning of NAACP v. Button, supra, than it can in the case of its members. Rather, the Commonwealth has merely created a circumstance, by virtue of the legislation it has enacted for welfare recipients, in which it may not be to the advantage of one group of recipients to associate with another for the purposes of bringing litigation.

Second, WRO concedes, and we agree, that in the absence of a nonseverability clause (section 20(b)),[14] the Pennsylvania legislature could have repealed section 20(a) if litigation against section 10 proved successful. Such a repeal would have replicated the effect of a nonseverability clause. The specter of such a repeal, of course, could well have had the effect of deterring WRO from challenging section 10.

Indeed, the Pennsylvania legislature could have gone further. There is little doubt that members of the legislature could have publicized their intention to repeal section 20(a) if section 10 was challenged successfully. Just as the possibility of a repeal of section 20(a) could have deterred WRO from bringing an action, a publicized intention to repeal section 20(a) in the event section 10 could not be implemented, would have proved an even greater deterrent.

The legislative debates, in fact, plainly reveal such an intention.[15]

Thus, recognizing that the instant legislation as enacted constitutes no greater deterrent than either of the two circumstances which we have hypothesized (both of which concededly would withstand constitutional challenge), we are not persuaded that such a "deterrent" effect can be said to effect an unconstitutional burden on the right of WRO to resort to the judicial process. These deterrent effects, if they are deterrent effects at all, reflect no more than the natural consequences of the legislative process, and must be faced by every organization contemplating a challenge to legislation.

We are satisfied, therefore, that the argument that WRO is constitutionally burdened by section 20(b), must fail. Section 20(b) does no more than express the legislature's intention to repeal section 20(a) unless section 10 is enforceable. We conclude that this marginal increase in the certainty of repeal does not establish a burden on WRO's right of judicial access, for it has yet to be demonstrated that a constitutional distinction exists between a repeal of section 20(a) after litigation has been commenced against section 10, and a repeal of section 20(a) *contingent* on litigation against section 10.[16]

## IV.

We turn to WRO's remaining arguments. First, WRO has alleged that WRO's members "have and will be deprived of the full educational and advocacy benefits" of

14. Section 26 of the Act contains a general severability clause pertaining to all provisions of the Act other than section 20. Because section 20(b) inextricably links sections 10 and 20(a), so that a successful challenge to section 10 prevents the implementation of the five percent increase of section 20(a), section 20(b) may be characterized as a "limited" nonseverability clause.

15. See note 5 supra.

16. We perceive a difference, to be sure, between the repeal of a statute after the legisla-

tion has been tested in court and an "advance repealer" by operation of a nonseverability clause. In the former case the legislature must act again and, in so acting, presumably would have the benefit of any opinion that may be rendered by the court. Nevertheless, whether it would be better policy to await the judgment of a court before repealing section 20(a) is a question for the legislature, not the courts. We simply hold that section 20(b) of this legislation does not burden WRO's right to challenge section 10.

WRO because the "threat of sanctions in Section 20(b) has drained the organization's resources by requiring WRO to spend considerable time discussing its options instead of providing counseling, referrals, education, and advocacy." Compl. ¶ 19; Appellant's Brief at 7. We do not find this argument convincing. Expenses of this nature are the lot of every advocacy group. The fact that WRO must devote resources to deciding on a course of action can hardly be classed as a constitutional burden on its right as an organization to advance the causes of its members.

Second, WRO argues that section 20(b) constitutes an unconstitutional penalty on its exercise of the right of access to the courts. Cf. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). In this respect, WRO argues that it must choose between foregoing litigation so that the eligible chronically needy may retain a five percent benefit increase, and instituting litigation, with the consequent risk that the eligible chronically needy will lose a five percent benefit increase if WRO succeeds in enjoining the implementation of section 10. Earlier in this opinion we concluded our consideration of WRO's "access to the court" argument by holding that section 20(b) is not an unconstitutional burden on

WRO's right to obtain judicial redress. That conclusion, and the analysis leading to it, necessarily resolves WRO's *Sherbert* claim as well. Absent the imposition of a constitutional burden, there can be no constitutional penalty.[17] Moreover, any claim that section 20(b) was enacted for the purpose of punishing WRO's exercise of the right to petition, see, e.g., Milhouse v. Carlson, 652 F.2d 371 (3d Cir.1981), must fail in the light of this record.[18]

## V.

Having concluded that section 20(b) does not restrict WRO or its members from access to the courts, and thereby does not impose a constitutional burden on WRO or its members, we will affirm the June 21, 1982 order of the district court which denied WRO a permanent injunction and which entered judgment in favor of the Commonwealth.

**17.** The Commonwealth's brief argues as follows:

The so-called "penalty cases" on which WRO relies clearly are inapposite here. In each of the cases cited by WRO [e.g., Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963),] individuals were denied generally available rights or benefits because of conduct which itself was constitutionally protected. In this case the statute exacts no penalty from any individual who successfully challenges Section 10; presumably that individual would receive the substantial benefit [sic] of eligibility for public assistance. WRO is not itself eligible for assistance, so it could

suffer no penalty [in the form of a denial of benefits], as a result of a successful challenge to Section 10.

Commonwealth's Brief at 18.

**18.** The legislative history reveals no such intent. To the contrary, the only intent disclosed was an intent to fund any increase from cost savings that could responsibly be effected. Indeed, the district court found "that the legislative intent in making Sections 10 and 20 nonseverable was not to penalize the plaintiffs for exercising their First Amendment rights but rather to ensure that there would be funds to provide the grant increase set forth in Section 20." Brookins v. O'Bannon, 550 F.Supp. 30, 31 (W.D.Pa.1982). Thus, WRO has failed to carry the burden of demonstrating a punitive legislative intent.