476 So.2d 1311 (1985)
AGUDO, PINEIRO & KATES, P.A., a Florida Professional Corporation and Calvin F. David, Appellants,
v.
HARBERT CONSTRUCTION COMPANY, an Alabama Corporation, and Harbert Corporation, an Alabama Corporation, Appellees.
No. 84-137.
District Court of Appeal of Florida, Third District.
September 17, 1985.
Rehearing Denied November 4, 1985.
*1312 Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel S. Perwin, Miami, for appellants.
Steel, Hector & Davis and Donald M. Middlebrooks and Lewis F. Murphy, Miami, for appellees.
Before BARKDULL, HENDRY and DANIEL S. PEARSON, JJ.
HENDRY, Judge.
This is an appeal by plaintiffs below, the law firm of Agudo, Pineiro & Kates, P.A. (Agudo) and attorney Calvin F. David, from an adverse final summary judgment terminating their claim against appellees Harbert Construction Company and Harbert Corporation (Harbert) for tortious interference with an attorney-client relationship. For reasons more fully developed below, we reverse and remand for further proceedings.

I.
This case arose as the result of an underlying action filed by Salvador Reyes-Vaca (Reyes) against Harbert. Reyes, an uneducated Ecuadorian laborer, was employed by Harbert Distral de Panama, a wholly owned subsidiary of Harbert, in the construction of an oil pipeline for Texaco in Ecuador. In 1980 Reyes was injured during the course of his employment by a high pressure pneumatic eruption from a valve in the pipeline. Reyes sustained a compound leg fracture and was admitted into an Ecuadorian hospital. During his recovery there, Reyes developed a severe infection in his injured leg which could not be treated in Ecuador. Harbert flew Reyes to an American hospital where he received medical attention and care for over a year. Harbert assumed the legal liability for all of Reyes' medical expenses and paid Reyes' salary to his mother in Ecuador.
Subsequently, Reyes was placed in a convalescent home in Miami to undergo physical therapy while his leg healed. Harbert retained a Spanish-speaking occupational therapist to ensure Reyes' arrival at the various doctors' and therapy appointments and to monitor his progress. While at the home, Reyes was befriended by an employee of the home, Martha Mason. Ms. Mason suggested to Reyes in early August, 1981 that Harbert was not treating him properly and that his bills were not being paid. She stated that she had a friend who was a lawyer, who would help him. The significance of this conversation will be discussed infra. Mason then called her former attorney, Antonio Pineiro, Jr., and told him that Reyes might be calling the law firm. Reyes called Pineiro and Pineiro drove to the convalescent home and met Reyes that day. They talked for two hours and agreed to talk again the next day. The next day, Pineiro's partner, Marcelo Agudo, took Reyes to the offices of appellant Calvin David, another Miami attorney, wherein an extensive interview was held. David concluded that Reyes had a substantial claim. David told Reyes that the Agudo firm would be handling that portion of Reyes' legal representation involving interpretation into the Spanish language and any matters to be conducted in Ecuador, and David would be primarily responsible for the lawsuit. In addition, David told Reyes that Alabama counsel would be necessary as Harbert Construction Company's headquarters were located in that state. After the interview Agudo drove Reyes to an appointment and returned to his office to prepare the fee agreement. Agudo took the 50% (trial/settlement) contingent fee agreement to the convalescent home, where Reyes signed it.
Thereafter, David retained Alabama counsel and a complaint was filed on August 10, 1981 in Alabama against Harbert. On August 21, 1981 Harbert received the complaint and gave instructions that same day to hold payment on Reyes' medical bills *1313 until Harbert could reach an agreement with Reyes' attorneys regarding the admissibility into evidence in a subsequent trial of any past and future medical payments. The negotiations between the attorneys occurred several months later and were never resolved. Meanwhile, the convalescent home communicated to Reyes that due to his medical bills not being paid, he would have to leave. Obviously distraught, Reyes called Pineiro. Pineiro called the home, confirmed the threat and elicited an agreement from the administration of the home to extend Reyes' stay for one month.
Harbert asserts that, thereafter, Reyes wrote a letter to John Harbert III, Chairman of the Board of Harbert Corporation, explaining his problems, that he had changed his mind about having attorneys, that he felt he had made a mistake and that he desired to have his leg healed, to return to Ecuador and his family and to continue to work for Harbert. Reyes asked Solomon Lepp, Harbert's officer in charge of Latin American operations, to meet with him in Miami. Agudo asserts that the letter was never mailed; that Harbert contacted Reyes and set up the meeting. In any event, Lepp, accompanied by Harbert's in-house counsel, met with Reyes at the home on October 30, 1981. The in-house counsel stayed outside while Lepp met with Reyes alone, although Lepp did confer with Harbert's lawyers twice during the course of the meeting. Just prior to the meeting, Reyes asked his English tutor, Oscar Solis, to draft a statement setting forth his concerns, specifically, that the treatment of his leg not be interrupted, that the company not retaliate against him, and that the company guarantee him a job, upon his return to Ecuador, which would take into consideration the present physical condition of his leg. The letter also stated Reyes' intention to drop the lawsuit. At the close of the meeting the letter was given to Lepp, who had it typed, then Reyes executed the document and it was notarized. Reyes next notified Agudo that he was dropping the lawsuit and dismissing the law firm. Pineiro and Agudo visited Reyes at the home and learned of the previous meeting between Lepp and Reyes.[1] The attorneys also examined the notarized document. In December, 1981, following a final operation on his leg, Reyes returned to Ecuador where he is presently working in a warehouse for Harbert.
Agudo thereafter filed this lawsuit against Harbert for tortious interference with an attorney-client relationship, alleging that Harbert wilfully interfered with the Reyes-Agudo business relationship, and through the use of threats, promises, economic coercion and intimidation induced Reyes to abandon his contractual relationship with the law firm and to release all claims against Harbert for an amount of money far below the amount which reasonably could have been expected to have been recovered. Harbert moved for summary judgment contending that the undisputed facts showed (1) that Reyes acted voluntarily, (2) that the settlement did not constitute tortious interference with Agudo's contract because of the parties' privilege to settle and Harbert's lack of the requisite intent to interfere in order to gain a direct advantage over the Agudo law firm, and (3) that the fee arrangement was unconscionable. The trial court agreed with Harbert and entered the contested final summary judgment.
At oral argument, this court raised an issue on its own motion: the relevance of Thomas v. Ratiner, 462 So.2d 1157 (Fla. 3d DCA 1984) to this case. The issue presented in both cases is the applicability of section 877.02, Florida Statutes (1981) to the respective fact patterns. This statute sets criminal penalties for the communication, by an employee of a hospital, with an attorney, for the purpose of aiding or assisting that attorney in the solicitation of legal business. In Thomas v. Ratiner, we held the fee contract obtained by the doctor/attorney in derogation of section 877.02 *1314 to be void ab initio. In the case at bar, the issue of the statute's applicability was not raised before the trial court. While we recognize that there are instances where errors are so glaring or fundamental that an appellate court will adjudicate them on its own initiative, Polyglycoat Corp. v. Hirsch Distributors, Inc., 442 So.2d 958, 960 (Fla. 4th DCA 1983), rev. dismissed, 451 So.2d 848 (Fla. 1984), we have decided that there are too many serious constitutional, procedural and factual questions presented in this case to allow us to proceed on the record before us. Therefore, we are remanding this action to the trial court for a full resolution of the issues discussed herein.

II.
The statute in question, section 877.02, states in relevant part:
(2) It shall be unlawful for any person in the employ of or in any capacity attached to any hospital, sanitarium, police department, wrecker service or garage, prison or court, or for a person authorized to furnish bail bonds, investigators, photographers, insurance or public adjusters, to communicate directly or indirectly with any attorney or person acting on said attorney's behalf for the purpose of aiding, assisting or abetting such attorney in the solicitation of legal business or the procurement through solicitation of a retainer, written or oral, or any agreement authorizing the attorney to perform or render legal services.
(3) Any person violating any provision of this section shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.
We note first that there are questions concerning the applicability of the statute in this case. The difficulty arises because the statute has been construed only occasionally. Carricarte v. State, 384 So.2d 1261 (Fla.), cert. denied, 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980); Pace v. State, 368 So.2d 340 (Fla. 1979); State ex rel. Farber v. Williams, 183 So.2d 537 (Fla.), cert. denied, 385 U.S. 845, 87 S.Ct. 42, 17 L.Ed.2d 76 (1966); Thomas v. Ratiner, 462 So.2d 1157 (Fla. 3d DCA 1984). By its own terms, the statute seems to require some form of relationship or agency linking the person covered under the statute and the attorney. It is clear that the statute requires more than a mere referral or recommendation. The Florida Bar v. Gaer, 380 So.2d 429 (Fla. 1980); Pace v. State, 368 So.2d at 343, (citing to State ex rel. Farber v. Williams). What is not clear, however, is what is meant by the phrase "to communicate ... with any attorney ... for the purpose of aiding, assisting or abetting ... solicitation of legal business."[2] The case law appears to suggest that the statute would not apply to situations involving an officious intermeddler whose communication was not instigated by an attorney. Pace v. State; State ex rel. Farber v. Williams. Thus, any interpretation of this statutory language will be a question of first impression.
Secondly, even if we were to resolve the above question and find that the statute applies to the case at bar, there is still the question of the effect of appellees' failure to raise the statute below. Florida Rule of Civil Procedure 1.110(d) lists illegality as an affirmative defense which "shall [be] set forth affirmatively." Rule 1.140(b) allows an affirmative defense to be raised either in the responsive pleading or by motion. The rule requires that the grounds on which the enumerated defense is based and the substantial matters of law intended to *1315 be argued be stated specifically and with particularity,[3] and further provides that any ground not stated shall be deemed to be waived. Furthermore, the motion for summary judgment under Florida Rule of Civil Procedure 1.510(c) was not based on this defense as indeed, it could not have been, since affirmative defenses may not be raised for the first time on a motion for summary judgment. Swift Independent Packing Co. v. Basic Food International, Inc., 461 So.2d 1017 (Fla. 4th DCA 1984); McIntyre v. Norman, 429 So.2d 1296 (Fla. 3d DCA), rev. denied, 438 So.2d 833 (Fla. 1983); Boyd v. International Fidelity Insurance Co., 412 So.2d 944 (Fla. 3d DCA 1982). The rules suggest, then, that the defense of illegality is waivable. If so, then in a contractual setting, the contract becomes merely voidable. The only defense that appears to be absolute and unwaivable is the defense of lack of subject matter jurisdiction. Fla.R.Civ.P. 1.140(h). Perhaps section 877.02 (albeit implicitly) suggests an analogous defense. This conclusion, however, is certainly not obvious. In any event, the question of whether the statute is an absolute or waivable defense has never been discussed by any court, see Carricarte v. State; Pace v. State; State ex rel. Farber v. Williams; Thomas v. Ratiner, and thus, the question of the voidability of a contract which runs afoul of the statute remains open also.
Thirdly, the court would be myopic if it failed to observe the constitutional questions raised by the statute's application. The Florida Supreme Court has ruled three times that the statute is constitutional. Carricarte v. State; Pace v. State; State ex rel. Farber v. Williams. However, even though the Florida Supreme Court has held that the statute is constitutional on its face, State ex rel. Farber v. Williams, the Court has also been careful to make certain that it is constitutional as it is applied. Carricarte v. State; Pace v. State. In this respect the Florida Supreme Court echoes the views of the United States Supreme Court. There are two lines of cases emanating from the United States Supreme Court; the first line dealing with first amendment rights to refer persons to specific attorneys, N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)[4] and its progeny: United Transportation Union v. Michigan Bar, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); United Mine Workers v. Illinois Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Railroad Trainmen v. Virginia Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); see also In Re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), and the second line dealing with attorney advertising as commercial speech, In Re R.M.J., 455 U.S. 191, 102 S.Ct. 929, *1316 71 L.Ed.2d 64 (1982); Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), which combine in this case to suggest that the statute should be applied only if its policies are plainly served. While the U.S. Supreme Court, in Ohralik v. Ohio State Bar Association, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), held that a state's organized bar, acting with state authorization, constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the state has a right to prevent,[5] the general rule remains that "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." N.A.A.C.P. v. Button, 371 U.S. at 439, 83 S.Ct. at 341, 9 L.Ed.2d at 421. Thus, the trial court, on remand, must strictly scrutinize the circumstances surrounding Ms. Mason's communication with Reyes and attorney Pineiro to make certain, as section 877.02 apparently requires, that she was clearly acting as an agent for Pineiro; clearly acting for the purpose of aiding Pineiro in the solicitation of legal business. Otherwise, her communications would be absolutely protected.

III.
All three of the above lines of thought make clear that the record is insufficient for us to proceed. And the most glaring example of the incomplete record concerns the reasons why Martha Mason told Reyes that he needed a lawyer and why she recommended the Agudo firm. This is vital information, yet it was not developed below because, since the nature of the communication was not raised, appellants didn't realize that it was important.[6] Without any testimony from Ms. Mason as to why she recommended this particular firm, all the record reflects is Mr. Pineiro's deposition testimony that Ms. Mason was a former client whom he had represented in the past, that she called him for the sole purpose of telling him that she had recommended the firm to Reyes and that Reyes might telephone Pineiro because he wanted to speak with a lawyer about his legal rights arising out of the accident and injury. Pineiro adamantly insisted that the call from Ms. Mason was unsolicited and unexpected and that she had never done this before. Pineiro also testified that it was Reyes who made the initial contact; that even though Pineiro was aware of the situation concerning Reyes' accident and injury, he did not act on his information until after Reyes telephoned and asked to meet with him.
Another glaring deficiency in the record is why Ms. Mason would tell Reyes that Harbert was not paying the medical bills when the bills were, in fact, being paid. Appellee Harbert ascribes bad motives to her and points to this "lie" as evidence that Ms. Mason was working for the Agudo firm. We note that there exists some evidence in the record to make the argument that Harbert was not paying Reyes' bills promptly, giving rise to the concern that there might be a problem. There is in the record a memo dated August 25, 1981 to William Powers (Harbert's general counsel), among others, reflecting that, as of that date, there was $14,338.00 in bills which had not yet been processed for payment. Mr. Powers acknowledged during his deposition that some of those bills were 60 and 90 days old. In addition, the record reflects a statement made by Marilyn Araujo, the occupational therapist hired by Harbert to coordinate Reyes' medical treatment and to serve as a liason between Harbert and the various institutions in Miami, that people at the convalescent home complained to her that Harbert was late paying the bills for Reyes' care at the home.
We express no opinion as to the weight or sufficiency of the above deposition testimony. We do believe, however, that it exemplifies the need for a full hearing before *1317 the trial court. We cannot assume that the facts in the record before us will not change. Once the trial court is in possession of all of the facts of the case, we feel certain that the concerns raised in part II of this opinion will be more easily resolved.

IV.
Finally, we are reminded that this case is before us upon the entry of a final summary judgment terminating appellants' claim against Harbert for tortious interference with an attorney-client relationship. We do not agree with the trial court's ruling. The undisputed evidence indicates that Reyes feared that treatment of his leg would cease, feared being expelled from the convalescent home, and feared the loss of monetary support from his employer  upon whom he was completely dependent  while at the same time being in a foreign country and away from his family. Arguably, these factors create a situation instinct with coercion and thus open to interference by Harbert in the attorney-client relationship. Since the record reflects that appellant established the requisite elements of a cause of action for tortious interference with a business relationship, see Bankers Multiple Lines Insurance Co. v. Farish, 464 So.2d 530 (Fla. 1985); Tamiami Trial Tours, Inc. v. Cotton, 463 So.2d 1126 (Fla. 1985), and since Harbert did not negate all of the inferences drawn in favor of Agudo, the entry of final summary judgment in favor of Harbert was error.

Conclusion
Against the backdrop of the first amendment rights of people to recommend specific attorneys, even though the state has recognized that recommendations by certain personnel may carry risks of fraud or over-reaching, courts have an obligation to proceed slowly on a case by case basis to ensure that both the constitutional and the statutory interests are respected. When, as here, procedural and factual infirmities in the record make it impossible for this court to engage in a reasoned analysis of the issues before us, the cause is not ripe for judicial review, not justiciable, and therefore we must remand to allow the trial court the opportunity to correct the deficiencies. Future action by the trial court may affect the structure of this case in ways that determine its present justiciability. L. Tribe, American Constitutional Law § 3-13 (1978). Accordingly, this cause is reversed and remanded for further proceedings.
Reversed and remanded.
DANIEL S. PEARSON, J., concurs.
BARKDULL, Judge, dissenting.
I respectfully dissent and would affirm the trial court's entry of summary judgment. There is no question on this record, as accurately reflected in the majority opinion, that but for the actions of the employee at the health care facility the lawfirm of Agudo, Pineiro and Kates, P.A., would not have been employed by the patient. Florida Statute, Section 877.02(2) (1979) reads in part as follows:
"It shall be unlawful for any person in the employ of... any ... sanitarium ... to communicate directly ... with any attorney ... for the purpose of ... any agreement authorizing the attorney to perform ... legal services."
Violation of this statute is a crime. See Section 877.02(3) Florida Statutes, (1979). A contract entered into as a result of such criminal activity is void. Thomas v. Ratiner, 462 So.2d 1157 (Fla. 3d DCA 1984); Williams v. Continental Life & Accident Company, 100 Idaho 71, 593 P.2d 708 (1979); 11 Fla.Jur.2d Contracts § 85; Anno. 55 A.L.R.2d 481. There can be no actionable interference with a void contract.[1]Thomas v. Ratiner, supra; Sunbeam *1318 Corporation v. Masters of Miami, Inc., 225 F.2d 191 (5th Cir.1955); Ely v. Donoho, 45 F. Supp. 27 (S.D.N.Y. 1942); Mindenberg v. Carmel Film Productions, Inc., 132 Cal. App.2d 598, 282 P.2d 1024 (1955); Colorado Accounting Machines, Inc. v. Mergenthaler, 44 Colo. App. 155, 609 P.2d 1125 (Colo.Ct.App. 1980); 86 C.J.S., Torts § 44, p. 965; Prosser, Law of Torts, § 129 at p. 931, (4th Ed. 1977). In C.J.S. we find the following:
"In order that the interference may constitute a tort, the contract must be valid, and contracts void for illegality, or by reason of repugnance to public policy, have been held not to be within the rule extending protection against interference with existing contractual rights ..."
Dean Prosser, in discussing the tort of interference with contractual relations states that:
"Virtually any type of contract is sufficient as the foundation of an action for procuring its breach. It must of course be in force and effect, and not illegal as in restraint of trade, or otherwise opposed to public policy, so that the law will not aid in upholding it ..."
The purpose of the statute,[2] when read in its entirety, is clear. It is to prevent just what happened in the instant case, "ambulance chasing." This court should not put its stamp of approval on any contract which has as its genesis criminal activity. I would therefore affirm the summary judgment.
Before SCHWARTZ, C.J., and BARKDULL, HENDRY, HUBBART, NESBITT, BASKIN, DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ.

ON HEARING EN BANC
PER CURIAM.
Upon consideration after oral argument, the order setting this cause for en banc hearing is discharged.
HENDRY, HUBBART, NESBITT, BASKIN, DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ., concur.
SCHWARTZ, Chief Judge (dissenting).
It is my view that the undisputed facts of the situation demonstrate that the attorney-client agreement in question was entered into in violation of section 877.02(2), Florida Statutes (1979), and that the panel decision, which fails to hold that this action for tortious interference with such a contract may not be maintained as a matter of law, is therefore in conflict with Thomas v. Ratiner, 462 So.2d 1157 (Fla. 3d DCA 1984), which does so hold. Since a panel is bound to follow previous decisions of this court, In re Rule 9.331, 416 So.2d 1127, 1128 (Fla. 1982), I believe that this cause must be considered en banc. On the merits, I agree with the dissenting panel opinion that, in accordance with Thomas, the judgment below should be affirmed.
BARKDULL, J., concurs.
NOTES
[1] Reyes cancelled a meeting with appellants which was scheduled for the same day as the Reyes/Lepp meeting. Appellants assert that somebody at Harbert called Reyes and told him to cancel the meeting with his attorneys.
[2] It needs to be emphasized that section 877.02(2) does not refer to a retainer fee contract or a fee agreement. Nor does subsection (2) contain the provisos set out in subsection (1). Thus, section 877.02(2) arguably applies even if the person specified in the statute refers someone to a legal services organization or an attorney who takes the case on a pro bono publico basis. We cannot assume that the legislature intended only to go after contingency contracts obtained as a result of "ambulance chasing" (oddly, paramedics are not included), since the statute also affects criminal law attorneys. Furthermore, as will be discussed infra, the original purpose of the statute was to provide a means for punishing attorneys involved in a certain type of public interest litigation for which no fees would be charged.
[3] Thus, appellees' argument that the defense of illegality on the basis of section 877.02 is subsumed in the defense of illegality on the basis of the unconscionable fee arrangement and thus we could find that the trial court's ruling was right (albeit for the wrong reason) is simply incorrect. First, the trial court set out no findings of fact or conclusions of law stating why it ruled as it did. Therefore, we have no way of knowing whether the defense of illegality on the basis of the unconscionable fee arrangement played any part at all in the court's decision to enter summary judgment in favor of Harbert. Second, as Loranger v. State, Department of Transportation, 448 So.2d 1036, 1039 (Fla. 4th DCA 1983) makes clear, the "right for the wrong reason" appellate maxim does not apply in summary judgment proceedings where the issue was never raised in the motion for summary judgment. As appellees admitted, section 877.02 was never raised below at all.
[4] The Virginia statute struck down in N.A.A.C.P. v. Button was similar to section 877.02. In fact, as Justice Douglas stated in his concurring opinion:

The amendments to Virginia's code, here in issue, were enacted in 1956. Arkansas, Florida, Georgia, Mississippi, South Carolina, and Tennessee also passed laws following our 1954 decision [Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)] which brought within their barratry statutes attorneys paid by an organization such as the N.A.A.C.P. and representing litigants without charge.
Id. at 371 U.S. 445, 83 S.Ct. 344, 9 L.Ed.2d 425. (Footnote citing to the specific statutes omitted). While section 877.02 was never used for the purpose for which it was enacted, it is important to know its genesis before making categorical statements about what the legislature intended when it enacted section 877.02.
[5] Clearly, Thomas v. Ratiner meets this test.
[6] Counsel for appellants stated at oral argument that no one could find Ms. Mason to take her deposition and it was not pursued because it was not thought to be important to locate her.
[1] The defendants pled that the contract was void for reasons other than Section 877.02 of the Florida Statutes, (1979), however, it has long been established appellate law in this state that a trial court can be right for any reason which is supported in the record. Gary v. Party Time Company, Inc., 434 So.2d 338 (Fla. 3d DCA 1983); Crown Life Insurance Company v. Garcia, 424 So.2d 893 (Fla. 3d DCA 1983).
[2] Florida Statute, Section 877.02(2) (1979)

"It shall be unlawful for any person in the employ of or in any capacity attached to any hospital, sanitarium, police department, wrecker service or garage, prison or court, or for a person authorized to furnish bail bonds, investigators, photographers, insurance or public adjusters, to communicate directly or indirectly with any attorney or person acting on said attorney's behalf for the purpose of aiding, assisting or abetting such attorney in the solicitation of legal business or the procurement through solicitation of a retainer, written or oral, or any agreement authorizing the attorney to perform or render legal services."